IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,           |
                                    |
            Plaintiff,              |
                                    |
VS.                                 | No. 221-CR-20179
                                    |
WILLIE FANT                         |
                                    |
            Defendant.              |
_____


TRANSCRIPT OF MOTION TO SUPPRESS

BEFORE THE

HON. U.S. MAGISTRATE TU PHAM


SEPTEMBER 19, 2022


APRIL LASSITER-BENSON
OFFICIAL COURT REPORTER
167 N. MAIN STREET - SUITE 408
MEMPHIS, TENNESSEE 38103


UNREDACTED TRANSCRIPT

1

2                          – A-P-P-E-A-R-A-N-C-E-S –

3

4    For the Plaintiff:

5                              **MR. GREGORY DAVID ALLEN**
                                DOJ-USAO
6                              167 NORTH MAIN STREET
                                SUITE 800
7                              MEMPHIS, TN 38103

8

     For the Defendant:
9
                               MR. STEPHEN R. LEFFLER
10                             LAW OFFICE OF STEPHEN R. LEFFLER, PC
                                1519 UNION AVENUE
11                             PO BOX 212
                                MEMPHIS, TN 38104
12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          UNREDACTED TRANSCRIPT

1                    **– I-N-D-E-X –**

2

3        **TESTIMONY OF BRIAN SCOTT**
         Direct Examination
4        By Mr. Allen                              13

5        Cross-Examination
         By Mr. Leffler                            18
6
         Redirect Examination
7        By Mr. Allen                              28

8        Recross-Examination
         By Mr. Leffler                            30
9

10       **TESTIMONY OF BRET SIMONSEN**
         Direct Examination
11       By Mr. Allen                              32

12       Cross-Examination
         By Mr. Leffler                            42
13
         Redirect Examination
14       By Mr. Allen                              48

15       Recross-Examination
         By Mr. Leffler                            49
16

17       **TESTIMONY OF ROBERT WEEKS**
         Direct Examination
18       By Mr. Allen                              51

19       Cross-Examination
         By Mr. Leffler                            73
20
         Redirect Examination
21       By Mr. Allen                             104

22       Recross-Examination
         By Mr. Leffler                           108
23

24

25

UNREDACTED TRANSCRIPT

1
## - I-N-D-E-X -

2

3    **TESTIMONY OF ANDREW MALISKAS**
     Direct Examination
4    By Mr. Allen                              111

5    Cross-Examination
     By MR. LEFFLER                            121

6

7    **TESTIMONY OF JOSEPH PALAZZOLO**
     Direct Examination
8    By Mr. Allen                              128

9    Cross-Examination
     By Mr. Leffler                            139

10
     Redirect Examination
11   By Mr. Allen                              150

12   Recross-Examination
     By Mr. Leffler                            153

13

14
## - E-X-H-I-B-I-T-S -

15

Exhibit No. 1                                55

16
Exhibit No. 2, Collective                     63

17
Exhibit No. 3                                 66

18
Exhibit No. 4                                 70

19
Exhibit No. 5                                115

20
Exhibit No. 5                                116

21
Exhibit No. 6                                135

22
Exhibit No. 7                                140

23
Exhibit No. 8, Late-Filed                     77

24

25

UNREDACTED TRANSCRIPT

```
1                              MONDAY
2                       September 19, 2022
3
4               --------------------------
5
6          THE COURT:  Good morning.  I'm actually Judge
7    Pham and we're here for an evidentiary hearing --
8    suppression hearing in the case of U.S. vs. Willie Fant,
9    Case No. 221-cr-20179.
10               Could I have the parties announce your
11   names for the court reporter?
12                On behalf of the Government?
13         MR. ALLEN:  Yes, good morning, Your Honor.
14   Gregg Allen for the Government.
15         MR. LEFFLER:  Stephen Leffler for the
16   defendant, Your Honor.
17         THE COURT:  And this is Mr. Fant who is
18   present here?
19         MR. LEFFLER:  He's present in the courtroom.
20         THE COURT:  And who would be the Government
21   representative?  Will you have on at counsel table?
22         MR. ALLEN:  That would be Special Agent
23   Palazzolo, P-A-L-A-Z-Z-O-L-O.
24         THE COURT:  Are the parties ready to proceed
25   with the hearing?
```

UNREDACTED TRANSCRIPT

1          **MR. ALLEN:**  Yes, Your Honor.  I advised

2   Mr. Haley earlier I have got one witness coming from

3   Bartlett -- oh, never mind.  He's here.  I'm ready.

4          **THE COURT:**  So all your witnesses are here?

5          **MR. ALLEN:**  Yes.

6          **THE COURT:**  Very well.

7          **MR. LEFFLER:**  We're ready.

8          **THE COURT:**  Is anyone calling for the rule?

9          **MR. LEFFLER:**  We are, Your Honor.

10         **THE COURT:**  The defense has called for the

11  rule of sequestration.  If there are any individuals in

12  the courtroom who will or may be called as a witness

13  you'll have to step outside and remain outside until it

14  is your time to testify.  We'll have someone come get

15  you.

16         **MR. ALLEN:**  Your Honor, the only thing left in

17  the courtroom for me is going to be my first witness and

18  then the Government representative.  We're ready to go

19  forward.  Three witnesses have stepped out and I've put

20  them across the hall.

21         **THE COURT:**  And they've been instructed not to

22  discuss their testimony?

23         **MR. ALLEN:**  They have earlier, but let me do

24  that one more time real quick.

25         **THE COURT:**  Okay.  Very well.

UNREDACTED TRANSCRIPT

1          (Short break.)

2          **THE COURT:**  Before I hear from the first

3     witness I'll allow the parties to make opening remarks if

4     you would like.  You can defer to -- or make opening and

5     closing.

6               Mr. Leffler?

7          **MR. LEFFLER:**  Your Honor, we'd prefer -- for

8     the opening I'll just refer the Court to our motion.

9          **THE COURT:**  For the Government?

10         **MR. ALLEN:**  Just, I think it's important to

11    have a brief summary of where we're starting at, Judge.

12              Mr. Fant was charged via

13    criminal complaint.  He was represented by the

14    federal public defender.  He was indicted and then a

15    superceding indictment returned.  The federal

16    defender filed a motion to suppress and then

17    subsequently came off the case.

18              Mr. Leffler took on the case, filed an

19    amended motion to suppress.  Those are really

20    attacking three partial search warrants challenging

21    whether there's probable cause within the four

22    corners of the affidavit.

23              Then there was a controlled delivery of

24    a fourth parcel.  Well, the third parcel -- a search

25    warrant was obtained for a controlled delivery.

UNREDACTED TRANSCRIPT

1    From there, he challenged that warrant as well.

2              While executing the controlled delivery,

3    Mr. Fant -- it's the Government's position he

4    returned in a vehicle and he was subject to a stop.

5    From that stop a phone was seized.  So the defense

6    is also challenging whether there was probable cause

7    or at least enough legal justification for the stop.

8    So that's where we are.

9              At this point, the Government's position

10   which has been laid out in the motions is, each of

11   the affidavits within the four corners contain

12   sufficient probable cause.  There's justification

13   within the warrant for the controlled delivery.  It

14   was narrowly tailored.  And then the stop, the

15   agents had probable cause to stop and arrest

16   Mr. Fant at that time, in addition to the other

17   grounds that we set forth in our motion for why the

18   stop was justified.

19             So the plan today is to call several

20   witnesses that we've made available.  We know we

21   have two obligations and I've spoken --

22   Mr. Leffler and I have handled cases together.  We

23   work well.  He asked me to call these witnesses for

24   him, so they're mainly for the -- Mr. Leffler and

25   Mr. Fant's benefit to have these witnesses here.

UNREDACTED TRANSCRIPT

1          The Government's position is Mr. Fant

2    doesn't have standing.  He has standing for the

3    search of the residence because it is his residence,

4    but the parcels -- he's trying to have it both ways.

5    He wants to challenge the warrants and say, I have

6    standing to challenge them, but he doesn't want to

7    say that these packages were delivered to him

8    because one of them had 253 grams of

9    methamphetamine.  So he needs to -- Mr. Fant needs

10   to decide what, in my opinion, which side of the

11   fence he wants to be on.  But I think that's just a

12   good starting point.

13          Of side note, I did receive Your Honor's

14   denial of a refusal motion.  That's Document 89.

15   The defendant essentially challenged whether Your

16   Honor should hear the motion to suppress, the parcel

17   affidavits, because Your Honor signed them.  My

18   response was that the case law was clear that the

19   judge can hear warrants before Your Honor that

20   you've signed.  In addition to that there's no

21   statement saying that you can't decide them fairly

22   on the facts.  And I'll also anticipate one witness

23   saying that there was no extrajudicial

24   communications between the Court and the affiant for

25   the parcel warrants in question.

1          So I think that's where we're at for a

2    starting point.  I'm going to have to go a little

3    bit out of order.  One of my witnesses needs to go

4    ahead and get going after their testimony.  But

5    other than that we're prepared and we'll go as long

6    as we need to, Your Honor.

7          **THE COURT:**  Mr. Leffler, do you wish to

8    respond before they call the first witness?

9          **MR. LEFFLER:**  Your Honor, the only response I

10   have is that there are some -- I anticipate there are

11   going to be some documents that I ask about that were not

12   provided in discovery.  And if I ask about those, I will

13   be -- and if I want to use any of those doc- -- if the

14   witness confirms that those documents exist, I would be

15   asking to have those delivered to the Government and then

16   entered as late exhibits -- late-filed exhibits to this

17   hearing.

18         **THE COURT:**  And what documents are these?

19         **MR. LEFFLER:**  Your Honor, there's a process

20   that the postal service has called 'mail cover' and that

21   is where a -- my understanding of mail cover, it's from

22   the Court Code of Federal Regulations.  It is where the

23   postmaster can authorize the employees at the postal

24   service to look out for particular packages that are

25   coming through.  And there's a process for getting a mail

UNREDACTED TRANSCRIPT

1    cover.  That one, I know I'm going to be asking about and

2    I know I don't have any documents on that at this point.

3              **THE COURT:**  All right.

4               Mr. Allen?

5              **MR. ALLEN:**  This is the first request I've

6    heard for this.  I'm not sure if it exists in this case.

7    I know from the agents that I've received -- I don't

8    believe any of those documents are in there.  I didn't

9    know to check or ask about that.  I can -- I can start

10   that process if they exist.  I don't know.  If they do

11   I'll be glad to turn them over.  It's not a situation

12   where the Government is not trying to not turn over

13   discovery.  I just -- those -- I didn't see them in what

14   was provided to me for discovery.  I can start the

15   process.

16             **MR. LEFFLER:**  And I'm not complaining that

17   they weren't provided in discovery.  This is a process

18   that I came across as I was preparing for this hearing.

19   And all I would be asking you would be if those -- if the

20   witness testifies that those documents do in fact exist,

21   that they be turned over to the Government so the

22   Government can provide them to me and we can enter them

23   as late exhibits to this hearing.

24             **THE COURT:**  And just to clarify, did you say

25   that you have requested these documents, specifically?

UNREDACTED TRANSCRIPT

1          **MR. LEFFLER:**  No, I have not.

2          **THE COURT:**  You have not?

3          **MR. LEFFLER:**  I have not requested them,

4    correct.  I don't know if they exist or not, so I was

5    going to -- some of the witnesses may know.

6          **THE COURT:**  Anything further before we call

7    our witness?

8          **MR. LEFFLER:**  No, Your Honor.

9          **THE COURT:**  I need to retrieve one item.  You

10   don't need to adjourn.  We'll take a recess.  I'll be

11   right back.  If you can have your witness take the stand.

12         **MR. ALLEN:**  Okay.

13         (Short break.)

14         **MR. LEFFLER:**  Your Honor, there is one other

15   thing that I wanted to ask the Court.  I have instructed

16   Mr. Fant not to try to talk to me while I'm listening to

17   the evidence.  I gave him a pad of paper and a pen to

18   write with so he can write notes for me.  Can I ask that

19   he be released from the light handcuffs so that he can

20   take notes during the course of the testimony?

21         **THE COURT:**  Yes.  If I can have the marshals

22   release the cuffs?

23              Very well.  Please raise your right

24   hand.

25         **DEFENDANT:**  Sorry, sir.

UNREDACTED TRANSCRIPT

1                              * * *

2                          **BRIAN SCOTT,**

3    was called as a witness, and after having been duly sworn,

4    testified as follows:

5              **THE COURT:**  You can be seated.  You can close

6    that door (indicating witness stand).

7                 The Government may proceed.

8              **MR. ALLEN:**  Thank you, Your Honor.

9

10                     **DIRECT EXAMINATION**

11   QUESTIONS BY MR. ALLEN:

12   *Q.*   Could you please state and spell your name for the

13   record?

14   *A.*   Yes, my name is Brian, B-R-I-A-N, Scott, S-C-O-T-T.

15   *Q.*   And where are you employed, sir?

16   *A.*   I am employed with the Memphis Police Department.

17   *Q.*   How long you been employed with the Memphis Police

18   Department?

19   *A.*   Fourteen years.

20   *Q.*   Throughout the course of the your employment with

21   the Memphis Police Department did you have occasion to

22   serve as a task force officer with the DEA?

23   *A.*   I did.

24   *Q.*   How long were you a Task Force Officer, a TFO, for

25   short?

UNREDACTED TRANSCRIPT

1    A.    Approximately two years.

2    Q.    Okay.  Two years?

3    A.    Yes, sir.

4    Q.    All right.  And was that time period -- did it

5    encompass August 18, 2021?

6    A.    It did.

7    Q.    During your time with DEA did you participate in

8    the investigation of Willie Fant?

9    A.    I did.

10   Q.    What was the extent of your participation in the

11   investigation?

12   A.    I was a major -- I was surveillance at the location

13   during and before the execution of a search warrant at

14   that location.

15   Q.    That was on August 18, 2021?

16   A.    That is correct.

17   Q.    Do you remember the address?

18   A.    1001 Creston.

19   Q.    1001 Creston?  Okay.

20          So just tell us what you did that day as far

21   as 1001 Creston.

22   A.    Yes.  Before the execution of the search warrant

23   Agent Palazzolo asked me to set up surveillance at the

24   location to observe any comings and goings, to make sure

25   that a package was delivered -- a mail cover package was

UNREDACTED TRANSCRIPT

*EXAMINATION OF BRIAN SCOTT*

1    delivered to that location at that time.

2         I sat back and observed.  I observed

3    multiple individuals in the driveway.  Also, I did

4    observe a silver SUV come to the location.  Two

5    male blacks got out and got back in and left the

6    location.

7         The mail package was delivered.  Once it

8    entered the house I gave the takeout signal for the

9    FBI swat team to execute the search warrant.

10   *Q.*    Okay.  And you knew you were out that day for

11   Willie Fant's address; correct?

12   *A.*    That is correct.

13   *Q.*    Were you provided any kind of description of

14   Mr. Fant, leading up to that?

15   *A.*    I was.

16   *Q.*    What was the description, do you recall?

17   *A.*    A male, black, possibly 5'9" to 5'10", 160 to

18   185 pounds.

19   *Q.*    What about the individuals in that silver SUV do

20   you recall?

21   *A.*    Yes, I did observe an individual that fit a

22   description of Willie Fant, but I wasn't able to identify

23   him definitely by his face or anything like that.  I --

24   *Q.*    Sorry to interrupt.

25        So on that day you didn't communicate to the

UNREDACTED TRANSCRIPT

1   other officers, hey, I saw Willie Fant leave in

2   this SUV?

3   A.   I did not.

4   Q.   But you did see someone, like you said, that fit

5   the description of Mr. Fant?

6   A.   That is correct.

7   Q.   And it was an SUV you said?

8   A.   Yes, a silver to gray SUV.

9   Q.   Okay.  So what happens after you get the takedown

10  signaling, what are you still doing at this point?

11  A.   What I'm still doing at this point, I'm basically

12  observing swat team for officer safety, for their safety.

13  And also observing any other vehicles coming and going in

14  the area from that location.

15  Q.   And did you observe any vehicles coming and going

16  in that location?

17  A.   I did, sir.

18  Q.   Which ones?

19  A.   It was the silver SUV that left earlier, came back

20  to the location.  And while they drove down the street

21  down Creston, he observed that -- I guess he observed the

22  execution of the search warrant and committed an illegal

23  U-turn in the -- at the location.

24  Q.   Did that stick out to you?

25  A.   It did.

UNREDACTED TRANSCRIPT

*EXAMINATION OF BRIAN SCOTT*

1   Q.    Why was that?

2   A.    From personal experience, 9 times out of 10 that

3   when somebody sees, say, a swat team or execution of a

4   search warrant, the individuals try to get out of the

5   area as soon as possible.

6   Q.    So you -- your -- what -- do you remember what time

7   this was?

8   A.    No, sir.  It's possibly, probably about five to 10

9   minutes after the execution of the search warrant.

10  Q.    Okay.  And what time was the execution of the

11  search warrant, do you remember?

12  A.    I do not recall.

13  Q.    Was it morning or afternoon?

14  A.    It was in the morning.  It was in the morning.

15  Q.    So the search warrant is being executed by the FBI

16  swat team.  You're still in the area conducting

17  surveillance, watching out for the other officers, you

18  see that same SUV?

19  A.    That is correct.

20  Q.    Okay.  And then it makes -- do you remember what

21  street it came down or where it was in comparison to the

22  house?

23  A.    I know possibly from the house it was very close to

24  the house.  So, I think you want to estimate footage,

25  probably no more than probably about 50 to 60 yards from

UNREDACTED TRANSCRIPT

*EXAMINATION OF BRIAN SCOTT*

1    the house.

2    *Q.*    And then what happens after the vehicle does this

3    U-turn?

4    *A.*    I placed it over the radio saying that the silver

5    SUV is back in the area.  It was driving down the street

6    and it just made an illegal U-turn, and for takedown

7    officers to check that vehicle.

8    *Q.*    And were you a participant in the checking of the

9    vehicle?

10   *A.*    No, I was not.

11   *Q.*    Do you recall if you ran the tags on the vehicle?

12   *A.*    No, I did not.

13   *Q.*    And were you one of the individuals that went to

14   stop that vehicle?

15   *A.*    No, I was not.

16   *Q.*    So you had no further interaction with that vehicle

17   after you put it out over the radio?

18   *A.*    That is correct.

19          **MR. ALLEN:**  I'll pass the witness.

20          **THE COURT:**  Cross-examination?

21

22

23

24

25

UNREDACTED TRANSCRIPT

*EXAMINATION OF BRIAN SCOTT*

1                          **CROSS-EXAMINATION**

2

3    QUESTIONS BY MR. LEFFLER:

4    *Q.*    Officer Scott.

5    *A.*    Good morning, sir.

6    *Q.*    Was 1001 Creston in the middle of the block or was

7    it closer to like a corner or --

8    *A.*    It was closer to a corner, sir.

9    *Q.*    What corner was it close to?

10   *A.*    I do not remember the cross street that it was

11   located at, sir.

12   *Q.*    How close was it to the corner?

13   *A.*    Possibly a house or two from the corner.

14   *Q.*    And when -- where were you set up for your

15   surveillance?

16   *A.*    I believe in the -- on that location it's like a

17   little hill.  From the location I had to a clear view

18   looking down the hill right by the corner of the house.

19   *Q.*    Were you on Creston?

20   *A.*    I was.

21   *Q.*    And how far away from the house were you parked?

22   *A.*    Possibly about 100 yards.

23   *Q.*    And your purpose for being there was to maintain

24   surveillance to -- for officer safety?

25   *A.*    No, sir.  My purpose there was also for officer

*EXAMINATION OF BRIAN SCOTT*

1    safety and also to observe the mail being delivered to

2    the house at the time -- the mail package.

3    *Q.*    M-A-I-L?

4    *A.*    Yeah, M-A-I-L, that is correct.

5    *Q.*    And then, did you understand the name of the person

6    who was the subject of this delivery?

7    *A.*    Yes, I did.

8    *Q.*    What was that name?

9    *A.*    Willie Fant.

10   *Q.*    And had you seen a photograph of Willie Fant prior

11   to that?

12   *A.*    Yes, during the briefing.

13   *Q.*    And when you saw two individuals come out of the

14   1001 Creston, did you believe one of those two to be

15   Willie Fant?

16   *A.*    No, I stated that Willie Fant was in the SUV.  He

17   did not come by Creston at that time.  He pulled into the

18   driveway.

19   *Q.*    He pulls into the driveway and somebody comes out

20   of Creston?

21   *A.*    Yes, that is correct.

22   *Q.*    And that person gets in the vehicle with Mr. Fant?

23   *A.*    No, sir.  What I stated is that while I was sitting

24   in surveillance, a silver SUV pulled into the driveway

25   with two male black individuals.  One fit the description

*EXAMINATION OF BRIAN SCOTT*

1  of Willie Creston [sic].  They pulled up --

2  *Q.*    I'm sorry.  Fit the description of who?

3  *A.*    I'm sorry.  Willie Fant.

4  *Q.*    Okay.  Thank you.

5  *A.*    And he got out of the vehicle and got back in the

6  vehicle and left the location.

7  *Q.*    Now when you say, "he," you are talking about

8  Willie Fant or one of the other individuals?

9  *A.*    One of the individuals.

10  *Q.*    One of the individuals?

11  *A.*    Yeah, there was two individuals in the vehicle --

12  the passenger of that vehicle.

13  *Q.*    When the vehicle pulls into the driveway, there are

14  two individuals in it?

15  *A.*    That is correct.

16  *Q.*    And another individual comes from inside of the

17  house and gets in there?

18  *A.*    No, sir.

19  *Q.*    I'm sorry.

20  *A.*    I understand.

21       What I'm stating is that two individuals in

22  a silver SUV pulled into the target location.  One

23  passenger of the vehicle who fit the description of

24  Willie Fant, got out of the vehicle for a short

25  period of time, got back into the vehicle and left

1    the location.  It was two individuals in the

2    vehicle and the passenger got out.

3    *Q.*    Did the passenger get back in?

4    *A.*    Yes, he did.

5    *Q.*    And then the vehicle drove away?

6    *A.*    That is correct.

7    *Q.*    It was -- was it before that or after that that the

8    package was delivered?

9    *A.*    It was after that.

10   *Q.*    How long after that?

11   *A.*    Possibly 20 to 25 minutes.

12   *Q.*    And when the package was delivered, had the SUV

13   come back to the house?

14   *A.*    Yes, he was -- no, he did not come back to the

15   house.  He was driving towards Creston, back towards the

16   house and that's when I saw the U-turn on the street,

17   drive away from the house.

18   *Q.*    You're getting a little ahead of me.  Let me ask

19   you some more questions.

20   *A.*    Oh, I'm sorry, sir.  I apologize.

21   *Q.*    After they left then a -- was it a postal service

22   van that pulled up with the package?

23   *A.*    Yes, sir.

24   *Q.*    And what did that package drive -- what did the

25   driver do from the van?

UNREDACTED TRANSCRIPT

1   A.   Yes, sir.  The driver got out the package, knocked

2   on the door and sat the package on the porch.

3   Q.   And did the driver ring the doorbell or just leave

4   it on the porch or what?

5   A.   I advised he knocked on the door.

6   Q.   You said, "he knocked on the door"?

7   A.   Yes, sir.

8   Q.   Did he wait for somebody to answer the door?

9   A.   No, sir, I don't believe so.

10  Q.   He turned and walked away?

11  A.   That is correct.

12  Q.   Got back in his van?

13  A.   That is correct.

14  Q.   When -- and how long did the package stay on the

15  porch until somebody opened the door?

16  A.   No more than five minutes.

17  Q.   About five minutes?

18  A.   Yes, sir.

19  Q.   And did you recognize the person who opened the

20  door?

21  A.   No, I did not.

22  Q.   Did you believe the person who opened the door to

23  be Willie Fant?

24  A.   No, I did not.

25  Q.   Why did you not believe it to be Willie Fant?

1    A.    The person who opened up the door did not fit the

2    description of Willie Fant.

3    Q.    And that person picked the package up?

4    A.    Yes, sir.

5    Q.    And took it inside?

6    A.    That is correct.

7    Q.    And what's the next thing that happened?

8    A.    At this time I notified that the package -- over by

9    radio, over our communication system, that the package

10   was in the location, to start the execution of the search

11   warrant.

12   Q.    Did you -- when you gave that notification did you

13   say that Willie Fant had picked up the package or did you

14   say anybody?

15   A.    No, I did not.  I advised that the package was

16   inside the location.

17   Q.    And then what happened?

18   A.    At this time FBI executed a knock and announce.  No

19   answer at the door was made at that time, made entry to

20   the location, cleared the location and also, they also

21   secured, I believe, three additional individuals that

22   were sitting in the driveway at the location.

23   Q.    Now, you may not be able to give me an exact

24   number, but about how many police officers were on the

25   scene at the time entry was made into the house?

1   A.   Oh, wow, I can not give you an exact number on

2   that, but it was quite a few.

3   Q.   Was it more than 10?

4   A.   Possibly -- yes, it was more than 10.

5   Q.   And how many police -- about how many police cars

6   were there?

7   A.   I can't estimate on that, but it was quite a few.

8   Q.   And were the police cars -- where were they

9   located?

10   A.   The police cars were located around the area of the

11   target location to sit off the street from traffic coming

12   up and also giving room for the FBI to execute the search

13   warrant.

14   Q.   So they had essentially blocked off the street of

15   Creston?

16   A.   Contained it, yes.

17   Q.   So if a motorist was to come along at that time,

18   what would that motorist have to do to get through there?

19   A.   Yes, they would have to go around and either make a

20   quick left or to leave the location.  That is correct.

21   Q.   Well, what could -- what would a motorist under

22   some circumstances have to make a U-turn to get away from

23   the blocked off street?

24   A.   Yes, that is possible.

25   Q.   Any motorist would have to do that, correct?

1   A.     That is correct.

2   Q.     Because they can't go through the police cars?

3   A.     Yeah, that would be kind of damage to their

4   vehicle, yes, sir.

5   Q.     Right.  Right.  And you saw the silver SUV return?

6   A.     That is correct.

7   Q.     And you said the silver SUV made a U-turn?

8   A.     That is correct.

9   Q.     And was that a logical thing for a motorist to do

10  when they come across a street that's blocked off by

11  police vehicles?

12  A.     It would be logical, but it was also at the house

13  at the time and I did put on communications that one

14  possibly fit the description of Willie Fant inside the

15  SUV.

16         **MR. LEFFLER:**  If I could have just a moment,

17  Your Honor?

18         **THE COURT:**  That's fine.

19  *BY MR. LEFFLER*

20  Q.     At any point did you have contact with the

21  individual who picked up the package and took it in the

22  house?

23  A.     No, I did not.

24  Q.     Do you know who that individual was?

25  A.     No, I do not.

1  Q.    Once you saw the silver SUV come down and make the

2  U-turn to avoid the police cars, what was your function

3  on the scene at that time from that point forward?

4  A.    My function on the scene at that time was to

5  continue surveillance.  And once I was clear from the

6  scene I left the scene.

7  Q.    How long did that take for you there?

8  A.    Possibly 30 to 45 minutes, about an hour, no more

9  than an hour.

10 Q.    I'm sorry, what were you doing during that time?

11 A.    I was sitting in the car still conducting

12 surveillance.

13 Q.    And did any officers that were on the scene when

14 you saw the silver SUV come and turn around, pursue the

15 silver SUV?

16 A.    What do you mean by "pursue," sir, as like a chase

17 or ...

18 Q.    No, like, follow it.

19 A.    Yes, I saw it.  I put it over the radio saying that

20 the silver SUV -- the officers then turned -- left and

21 went to conduct a traffic stop on that silver SUV.

22 Q.    And those were officers that were on the scene when

23 you sent the radio transmission out?

24 A.    That is correct.

25 Q.    You saw them leave the scene or did you see them

*EXAMINATION OF BRIAN SCOTT*

```
 1   leave the scene to pursue that vehicle?

 2   A.    I don't recall.

 3             MR. LEFFLER:  Your Honor, that's all I have

 4   for this witness.

 5             THE COURT:  Any redirect?

 6             MR. ALLEN:  Just briefly.

 7

 8                   REDIRECT EXAMINATION

 9   QUESTIONS BY MR. ALLEN:

10   Q.    Officer Scott, let's go back and talk about two

11   things:  One, the order of events, right?

12   A.    Yes, sir.

13   Q.    So you're conducting surveillance first.

14   A.    Yes.

15   Q.    And then that's when you see the individual that

16   matched Willie Fant's description arrive in the silver

17   SUV on the passenger side?

18   A.    That is correct.

19   Q.    And then that individual leaves in the passenger

20   seat again in that silver SUV?

21   A.    That is correct.

22   Q.    The package is delivered and taken into the house?

23   A.    That is correct.

24   Q.    And takedown signal is given?

25   A.    That is correct.
```

*EXAMINATION OF BRIAN SCOTT*

1    Q.    And as the FBI is executing the entry into the
2    house, is that when that silver SUV comes back?
3    A.    Yes, sir, approximately right after that, yes, sir.
4    Q.    And then the area that you mention, the Creston,
5    was obviously blocked off for this execution of the
6    search warrant to happen, right?
7    A.    Yes, sir.
8    Q.    Where exactly does this vehicle travel in relation
9    to the area being blocked off before it makes the U-turn?
10   A.    It basically was going towards the -- I really
11   don't know the direction.  I apologize about that.  But
12   it was going towards the home.  And once that driver of
13   the vehicle saw the cars he instantly conducted a U-turn
14   to go back the opposite direction.
15   Q.    Did the vehicle come all the way up to where the
16   barricade was or was the U-turn a little further back?
17   A.    Actually, I was approximately, like I stated,
18   probably about 50 to 60 yards from that location.  That
19   SUV drove right past my vehicle and then conducted a
20   U-turn.  So I can literally say it was probably about 50
21   to 60 yards from my location.
22   Q.    And the U-turn, did it stick out to you in any way
23   or was it a normal U-turn?
24   A.    It was a very quick U-turn.  But what really
25   brought it to my attention was that that same SUV which I

*EXAMINATION OF BRIAN SCOTT*

1   did state over the radio had the description of Willie

2   Fant on the inside of it.  And that's what stuck out to

3   me the most, that he made a quick U-turn and tried to

4   leave.  They tried to leave the location and that's what

5   made me want to put it out over the radio that this

6   vehicle possibly needed to be checked.

7           **MR. ALLEN:**  Okay.  That's all the questions I

8   have.

9           **MR. LEFFLER:**  Your Honor, may I ask one more

10  question?

11          **THE COURT:**  Yes, you may.

12

13                    **RECROSS-EXAMINATION**

14  QUESTIONS BY MR. LEFFLER:

15  *Q.*    Officer Scott, after the SUV initially left the

16  Creston address --

17  *A.*    Which occurrence, sir -- I mean, which time did he

18  leave, the first time or the second time?

19  *Q.*    The first time --

20  *A.*    Yes, sir.  Go ahead.

21  *Q.*    Before the takedown, correct?

22  *A.*    Yes, sir.

23  *Q.*    Did any other vehicles try to go down Creston that

24  were interrupted by the police vehicles blocking the

25  street?

UNREDACTED TRANSCRIPT

*EXAMINATION OF BRIAN SCOTT*

1    A.    I do not recall, sir.

2    Q.    But you were there the whole time surveilling?

3    A.    Yes, sir.

4              **MR. LEFFLER:**  That's all the questions I have,

5    Your Honor.

6              **THE COURT:**  You may step down.

7              **THE WITNESS:**  Thank you, sir.

8              (Witness excused.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

1              **MR. ALLEN:**  The Government calls

2    Bret Simonsen.

3              **THE COURT:**  Please stand in front of the

4    podium and raise your right hand to be sworn in to

5    testify.

6                             * * *

7                        **BRET SIMONSEN,**

8    was called as a witness, and after having been duly sworn,

9    testified as follows:

10             **THE COURT:**  Take the stand.

11

12                    **DIRECT EXAMINATION**

13   QUESTIONS BY MR. ALLEN:

14   *Q.*    Good morning, sir.  Could you please state and

15   spell your name for the record?

16   *A.*    Bret Simonsen, B-R-E-T, S-I-M-O-N-S-E-N.

17   *Q.*    And what is your current role at -- or where are

18   you currently employed?

19   *A.*    Currently, I work for Shelby County Sheriff's

20   Department and I'm assigned to the DEA Task Force here in

21   Memphis.

22   *Q.*    As your assignment as DEA Task Force, do you have a

23   role at the DEA?

24   *A.*    I'm a group supervisor.

25   *Q.*    And what does that mean?

*EXAMINATION OF BRET SIMONSEN*

1    *A.*    I have agents and TFOs that work underneath me.

2    I'm basically the boss there for that particular group.

3    *Q.*    And as part of your role as the group supervisor do

4    you assist in operations such as search warrants and

5    things like that?

6    *A.*    I do.

7    *Q.*    How long have you been with the Shelby County

8    Sheriff's Office?

9    *A.*    Approximately 22 years.

10   *Q.*    And then how long have you been in your role as a

11   Task Force Officer with the DEA?

12   *A.*    It will be two years at the end of October.

13   *Q.*    And in that two years how long have you been a

14   group supervisor?

15   *A.*    The whole time.

16   *Q.*    Did you have occasion to participate in the

17   investigation of Willie Fant in August of 2021?

18   *A.*    I did.

19   *Q.*    And what was the extent of your participation in

20   the investigation?

21   *A.*    Other than being the supervisor over the team

22   during the actual search warrant itself, I was a

23   paremeter lookout, basically.

24   *Q.*    So, as your role as a supervisor, do you -- what

25   would you have done as far as the investigation?

UNREDACTED TRANSCRIPT

*EXAMINATION OF BRET SIMONSEN*

1    *A.*    As far as the investigation itself I don't play a

2    critical part in the investigating itself.  I bring

3    groups together, the swat teams or whatever, that might

4    be involved in the actual search warrant itself, ensure

5    that everybody's notified, review the ops plan to make

6    sure that it's correct.

7    *Q.*    Do you review reports of agents underneath you?

8    *A.*    I do.

9    *Q.*    So you review those and essentially approve them as

10   well?

11   *A.*    That's correct.

12   *Q.*    Do you recall approving reports on the Willie Fant

13   investigation?

14   *A.*    I did.

15   *Q.*    So, direct your attention to August 18, 2021.  Did

16   you have the occasion to participate in the execution of

17   a controlled delivery at 1001 Creston?

18   *A.*    I did.

19   *Q.*    And at that point would you say that you're up to

20   speed on the latest in the investigation because of your

21   role as group supervisor?

22   *A.*    Correct.

23   *Q.*    And would you have communicated regularly with the

24   case agent about the case?

25   *A.*    I would.

UNREDACTED TRANSCRIPT

1    Q.    Who was the case agent?

2    A.    Joey Palazzolo.

3    Q.    Let's go to that August 18, 2021 date.  Tell us

4    what you were doing.  You mentioned "perimeter."

5    A.    Correct.

6    Q.    Okay.  Tell us what you did that day.

7    A.    Basically, when the entry team, in which we used

8    FBI swat team that day, when they made their approach and

9    prior to when the actual parcel was delivered I had an

10   outside paremeter.  So once they hit, I secure a couple

11   streets to keep traffic from going into that area, which

12   would have been southeast of that particular location.

13   Q.    Do you remember -- like, could you describe the

14   scene for us in the surrounding area, what all was

15   blocked off to prevent traffic from coming through?

16   A.    At my location --

17   Q.    Right, just your location.

18   A.    Yeah, at my location I was at an intersection,

19   which would have been one block south, two blocks east.

20   I believe the cross street might have been Raymond.  And

21   I blocked that intersection to keep traffic from going

22   towards the target location.

23   Q.    What happened as you were sitting out there on the

24   perimeter?

25   A.    After the execution of the warrant, I obviously

1   kept an eye back and forth and noticed that there was a

2   silver/gray SUV that proceeded.  My line of sight would

3   have been just the intersection of Creston and Raymond.

4   And it was proceeding westbound.  And I just caught a

5   glimpse of the vehicle going that way.

6   *Q.*   Did you do anything in regards to that vehicle?

7   *A.*   At that time I made mention on the radio and I

8   believe -- well, previously to that we had information

9   that a vehicle matching that description had left the

10  target location prior to us executing any of this

11  operation.  So, to me, it matched the description, so I

12  put it out over the radio.

13  *Q.*   Do you recall hearing it being put out on the radio

14  by another officer that morning as well?

15  *A.*   Yes, I believe it was -- Officer Scott put that the

16  vehicle had done a U-turn and was going back eastbound

17  towards, I believe it would be -- Old Millington might

18  have been the road.

19  *Q.*   And what did you do with regards to that vehicle

20  next?

21  *A.*   So, it passed my line of sight.  I proceeded

22  eastbound and did an intercept on that vehicle a couple

23  blocks down and pulled him over.

24  *Q.*   And what was your basis for pulling that vehicle

25  over?

*EXAMINATION OF BRET SIMONSEN*

1    A.    Because we suspected that our main target was going

2    to be a passenger in that vehicle.

3    Q.    And why was that your suspicion?

4    A.    Because the vehicle had been at that house prior.

5    It had just went towards the house, did an abrupt U-turn

6    and left again.  It seemed pretty suspicious to us for a

7    vehicle to do that.

8    Q.    Now, at this point, had the case agent or yourself

9    made a decision whether or not you were going to arrest

10   Willie Fant on that day?

11   A.    Not to my knowledge.

12   Q.    But at that point did you believe you could detain

13   him?

14   A.    Oh, absolutely.  I mean, we had probable cause, due

15   to the investigation.  But he fled the scene or that

16   vehicle fled the scene from where a search warrant was

17   occurring.  So, yes.

18   Q.    And so, you pulled up behind this vehicle.  Are you

19   with anyone or any other officers?

20   A.    I'm by myself at the time.

21   Q.    Did you happen to check the license plate?

22   A.    I read the license plate off on the radio.

23   Q.    And do you recall who it came back to?

24   A.    Shortly thereafter it came back to a Raymond Fant.

25   Q.    Okay.  So you get behind the vehicle, you stop it.

1    Then what do you do next?

2    A.    I go up to the driver, identify myself, ask for his

3    ID.   During that timeframe I'm trying to identify who the

4    passenger is.  I'm having a very difficult time.  The

5    passenger had a seat laid back.  He was basically hiding

6    it seemed to me, for me to get any visual on him.

7    Q.    So you come up to the driver side of the vehicle

8    and can you see the driver?

9    A.    I can see the driver, yes.

10   Q.    From there what line of sight do you have or what

11   can you see as far as the passenger?

12   A.    The passenger, I can see his lap, his hands, and

13   part of his legs.

14   Q.    Now, you're leaning back.  Is that the way the seat

15   was positioned?

16   A.    He was leaning back, yes.

17   Q.    Okay.

18   A.    His seat was positioned in a reclining position.

19   Q.    So what happens next?

20   A.    I see that the ID had a Raymond Fant.  I asked

21   Mr. Fant over there what his name was, if he had any

22   identification on him.  And during this entire course of

23   time he doesn't lean up or talk to me.  His hands are

24   still moving around his waist area.

25   Q.    What did that -- how did that cause you to feel at

*EXAMINATION OF BRET SIMONSEN*

1    that moment?

2    A.    Well, during the briefing we knew that he had some

3    violent history in his past.  I was concerned that he

4    might be trying to hide a gun or pull a gun.  I'm not

5    real sure.

6              **MR. LEFFLER:**  Sorry, Your Honor, I don't know

7    if he's referring to Raymond Fant or Willie Fant.

8    *BY MR. ALLEN*

9    Q.    The person that you mentioned that's leaning back

10   and motioning, who is that you referring to?

11   A.    He turned out to be Willie Fant.

12   Q.    Okay.  And you -- look around the Court.  Do you

13   see that individual here today?

14   A.    It's the individual seated there with the red shirt

15   on.

16             **MR. ALLEN:**  Your Honor, I just ask for the

17   record that he's identified Mr. Fant -- Willie Fant.

18             **THE COURT:**  The record will so reflect.

19             **MR. ALLEN:**  And I'll do a better job.

20   *BY MR. ALLEN*

21   Q.    Mr. Willie Fant is driving.

22   A.    Correct.

23   Q.    And that's the individual who produced the driver's

24   license to you?

25   A.    That's correct.

*EXAMINATION OF BRET SIMONSEN*

1    Q.    And then at that point you turned your attention to

2    the passenger who you've identified as Mr. Willie Fant?

3    A.    I hadn't positively identified him yet.  I actually

4    had to step forward so I could get a better line of sight

5    on him and leaned down and asked him specifically if he

6    was Willie Fant.  And he did indicate that he was.

7    Q.    And you leaned down from the driver's side?

8    A.    From the driver's side, yes.

9    Q.    And once he identified himself as Willie Fant what

10   did you do next?

11   A.    His hands are still doing a motion.  I drew my

12   firearm out and basically told him to put his hands up on

13   the dash where I could see them, walked around to his

14   side of the vehicle and removed him from the vehicle and

15   detained him at that time.

16   Q.    And you're still by yourself at this point?

17   A.    That's correct.

18   Q.    And after you detained Mr. Fant what did you do

19   next?

20   A.    Got on the radio and requested more cars to make my

21   signal.

22   Q.    Did you have any other participation in the

23   investigation after that?

24   A.    No.

25   Q.    Or for that specific date in regards to Mr. Willie

1   Fant?

2   A.   No.

3   Q.   What about Mr. Raymond Fant, what happened after

4   Mr. Willie Fant was detained?

5   A.   We left.  Raymond Fant indicated that he was

6   crippled, I guess.  He said he needed a walker to

7   actually get out of the car so I allowed him to stay in

8   the vehicle until my backup arrived and we spoke with him

9   and asked him for consent to search his vehicle.  And

10  during that time, got his walker out of the back hatch,

11  let him go to my vehicle and he sat in my vehicle, which

12  was a Tahoe, during the time of the search.

13  Q.   Did Mr. Raymond Fant provide consent with it?

14  A.   He did.

15  Q.   Do you recall if anything of substance was

16  recovered?

17  A.   I don't know if there was anything recovered on the

18  vehicle.  I don't believe so.

19  Q.   And did you participate anymore or have any other

20  interactions with Mr. Willie Fant after the other, I'll

21  call it backup, for lack of a better term, arrived?

22  A.   No direct involvement.  There might have been some

23  small talk, not real sure, once all the other vehicles

24  and the scene got secured.  And I believe he was seated

25  on the curb during this, once everybody else arrived and

*EXAMINATION OF BRET SIMONSEN*

1    the search took place.

2    Q.    Did you search Mr. Fant?

3    A.    I would have searched him, done a pat-down on

4    him once he was removed from the vehicle to ensure he

5    didn't have any weapons on his person.

6    Q.    But you don't -- you recall if you found anything

7    on him?

8    A.    I don't recall.  He might have had a phone on him.

9    If he did I would have sat that on the roof of the

10   vehicle or on the hood just to get it away from his

11   person so he can't make phone calls.

12   Q.    Did you take a formal statement or anything from

13   Mr. Fant?

14   A.    I did not.

15         **MR. ALLEN:**  Pass the witness.

16         **THE COURT:**  Cross-examination?

17

18                    **CROSS-EXAMINATION**

19   QUESTIONS BY MR. LEFFLER:

20   Q.    Officer, the -- you were present at Creston, close

21   to Raymond Street; is that correct?

22   A.    I wasn't at Creston and Raymond.  I was at the

23   street South of there, which would have been one block

24   South, a couple blocks to the East.

25   Q.    On what street?

UNREDACTED TRANSCRIPT

*EXAMINATION OF BRET SIMONSEN*

1  *A.*    I don't recall.  I'd have to look at a map to see

2  what the actual street name of it was.

3  *Q.*    But you were there -- were you there when the

4  SUV -- were you there after the search warrant was

5  initiated?

6  *A.*    I was.

7  *Q.*    And there were a lot of police cars there in the

8  area, correct?

9  *A.*    At my location it was just me.

10 *Q.*    But at the Creston location, were there a lot of

11 police cars there?

12 *A.*    I'm assuming there was, yes.

13 *Q.*    Did they --

14 *A.*    But again I didn't a visual on Creston.

15 *Q.*    What could you see from where you were?

16 *A.*    I could see West on the street in one direction.

17 *Q.*    On which street?

18 *A.*    Again, if you'll allow, I can pull the maps up and

19 tell you exactly what the street name is, if you want me

20 to.

21 *Q.*    That would be fine.

22        **MR. ALLEN:**  I've got it on Google Maps.  We

23 can plug it in.

24        **MR. LEFFLER:**  Oh.  We may have a little bit of

25 a more formal way of doing this.

UNREDACTED TRANSCRIPT

1          **THE WITNESS:**  I believe it's going to be

2   Carrolton.

3   *BY MR. LEFFLER*

4   Q.    Do you see the location on the screen to your left?

5   A.    It snuck up on me.  Yes.

6   Q.    All right.  And would you please circle where you

7   were?  You can just use your finger on the screen and

8   circle where you were while the search was taking place.

9          And that was at the corner of Carrolton and

10  what?

11  A.    Randolph.

12  Q.    And Randolph.  Okay.  All right.  Thank you.

13  A.    I misspoke earlier.  I --

14  Q.    Had you been at that location since you first

15  arrived on the scene that day?

16  A.    After we left the briefing area I went directly to

17  that location, yes, sir.

18  Q.    And why did you set up in that particular location?

19  A.    Just to keep vehicles from going to where -- since

20  we're having a tactical team at the location we didn't

21  want civilians in the area.

22  Q.    Did any civilians come by that you had to turn

23  away?

24  A.    There were several that I had either turned to the

25  South or the East.

*EXAMINATION OF BRET SIMONSEN*

1    Q.    And how -- did they make you turn to do that or did

2    they go --

3    A.    No, they would have made a left or a right,

4    depending their direction of travel.

5    Q.    All right.  And you stayed at that location until

6    what stage of the search?

7    A.    When the SUV went past I saw it and then

8    Detective Scott stated that he believed that was the SUV

9    from earlier that Mr. Fant had gotten into.  That's what I

10   meant by that location.

11   Q.    And where did you understand the SUV took its

12   U-turn?

13   A.    I -- I don't know where the SUV took the U-turn.

14   But, again, I would imagine, and this would just be a

15   guess, that it would be in that location there.

16   Q.    Okay.

17   A.    Because it was out of my visual.

18   Q.    I thought the circle indicated that's where you

19   were.

20   A.    Oh, you're correct.  I'm sorry.  I put my wrong

21   glasses back on.  It's tough getting old.

22   Q.    Okay.  You just made a mark there.  And what does

23   that mark indicate?

24   A.    Where possibly the SUV did its U-turn.

25   Q.    All right.  And was your understanding that the SUV

UNREDACTED TRANSCRIPT

*EXAMINATION OF BRET SIMONSEN*

1   was going West on Creston at the time it made a U-turn or

2   East?

3   A.    That would have been West.

4   Q.    And so, it turned around and went East is your

5   understanding?

6   A.    Correct, back to Millington and then went South on

7   Millington.

8   Q.    Were you ever able to see the SUV from your

9   location there at --

10  A.    I can see the SUV in this intersection of Randolph

11  and Creston.

12  Q.    Were you able to see it and make a U-turn?

13  A.    No.

14  Q.    Were you able -- did you ever see any other

15  vehicles come up to that same location that you just

16  marked there at Creston, and have to be diverted?

17  A.    Not that I'm aware of.

18  Q.    Did you have -- did you observe the SUV commit any

19  traffic violations prior to pulling out?

20  A.    No, sir.

21  Q.    Did it have expired tags?

22  A.    Not that I'm aware of.

23  Q.    Well, was it driving -- did you know whether it was

24  driving erratically at any point?

25  A.    Not in my presence, no.

1   Q.    And did you have an arrest warrant for Willie Fant?

2   A.    I did not.

3   Q.    When you patted down Mr. Fant I believe you said

4   you think you remember finding a phone on him.

5   A.    It's a possibility.  I'm not 100 percent sure on

6   that.

7   Q.    I saw one report that said there was $50 on him.

8   Do you recall that?

9   A.    I recall he did have some money.

10  Q.    But you don't know how much?

11  A.    No, sir.

12  Q.    Did you remember finding a necklace that he had?

13  A.    I don't believe I did.  I would not have taken

14  property off of him at the time that was not a threat.

15  Q.    When you said you approved reports on the Fant

16  investigation, what does that mean?

17        What does "approving reports" mean?

18  A.    It means that I would review the reports of the

19  case agent or other individuals that are associated with

20  the investigation, right.  Of course, the DEA has

21  numerous different types of reports and they would come

22  to me and approve them to be put into the case file.

23            **MR. LEFFLER:**  Your Honor, that's all the

24  questions I have for this witness.

25            **THE COURT:**  Redirect?

UNREDACTED TRANSCRIPT

1          **MR. ALLEN:**  Just briefly.

2

3                   <u>**REDIRECT EXAMINATION**</u>

4     QUESTIONS BY MR. ALLEN:

5     *Q.*    Do you recall speaking to Raymond Fant after the

6     traffic stop?

7     *A.*    Yes.

8     *Q.*    Do you recall, specifically, if he made any

9     statement that Willie Fant told him regarding the house?

10          **MR. LEFFLER:**  Object to hearsay, Your Honor.

11          **THE COURT:**  Response?

12          **MR. ALLEN:**  Your Honor, this is a suppression

13    hearing so the rules are relaxed and it's not offered for

14    the truth of the matter asserted.  It's offered for what

15    they did next in the investigation.

16          **THE COURT:**  Objection overruled.

17          **THE WITNESS:**  He stated that when he was

18    driving towards Mr. Willie Fant's house that when they

19    got a visual of the house and noticed all the activity

20    going on there, Willie Fant stated, "Turn around.  Turn

21    around.  Go, go."

22    *BY MR. ALLEN*

23    *Q.*    He stated -- that's what Mr. Fant advised you

24    that -- Mr. Raymond Fant advised you that Mr. Willie Fant

25    told him that day?

1   *A.*     That's correct.

2   *Q.*     And just to be clear, when you stopped this vehicle

3   you did so at the direction of other officers, right?

4   *A.*     That's correct.

5   *Q.*     And this wasn't based on a traffic stop, this was

6   an investigatory stop?

7   *A.*     That's correct.

8   *Q.*     Because you were looking and attempting to detain

9   Mr. Willie Fant?

10   *A.*     That is correct.

11           **MR. ALLEN:**  No additional questions.

12           **THE COURT:**  Mr. Leffler?

13

14                  **RECROSS-EXAMINATION**

15   QUESTIONS BY MR. LEFFLER:

16   *Q.*     Why were you looking to detain Willie Fant?

17   *A.*     He was a suspect in this investigation.

18   *Q.*     The investigation into 1001 Creston?

19   *A.*     Yes, and I believe there might have been some other

20   locations.  But today my job was -- the case officer was

21   running the case -- was out there on the perimeter.  I

22   stopped that vehicle.  Mr. Fant was our suspect and I did

23   detain him just to figure out exactly what the case

24   officer wanted to do.

25   *Q.*     And so, then after you detained him you made

*EXAMINATION OF BRET SIMONSEN*

1    contact with the case officer?

2    A.    That's correct.

3    Q.    Who was the case officer?

4    A.    Mr. Palazzolo.

5    Q.    And what did he tell you?

6    A.    He said, "Take him into custody and transport him

7    down to our office."

8            **MR. LEFFLER:**  That's all the questions I have.

9            **THE COURT:**  Anything further?

10           **MR. ALLEN:**  Not from this witness.

11           **THE COURT:**  You may step down.

12           (Witness excused.)

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

1          **THE COURT:**  You may call your next witness.

2          **MR. ALLEN:**  Thank you.  The Government calls

3    Special Agent Robert Weeks.

4          **THE COURT:**  Please stand in front of the

5    podium and raise your right hand to be sworn in to

6    testify.

7                              * * *

8                         **ROBERT WEEKS,**

9    was called as a witness, and after having been duly sworn,

10   testified as follows:

11         **THE COURT:**  Please take the witness stand.

12

13                    **DIRECT EXAMINATION**

14   QUESTIONS BY MR. ALLEN:

15   *Q.*   Good morning, sir.  Could you please state and

16   spell your name for the record.

17   *A.*   Robert Weeks, R-O-B-E-R-T, W-E-E-K-S.

18   *Q.*   And where are you employed, sir?

19   *A.*   I'm a task force agent for the United States drug

20   task force DEA.  I'm also a US Postal inspector.

21   *Q.*   How long have you been working as a postal

22   inspector?

23   *A.*   I'm in my ninth year now.  Ninth year.

24   *Q.*   And how long have you been with DEA?

25   *A.*   I've been with DEA going on my third year now.

*EXAMINATION OF ROBERT WEEKS*

1    Q.    In the course of your employment with DEA, is part

2    of your job to investigate drug traffic crimes and write

3    search warrants?

4    A.    That's correct.

5    Q.    How many search warrants would you estimate that

6    you've written just in your couple years with DEA?

7    A.    I average two to three a week.  So if you do the

8    math, maybe over 100.

9    Q.    Would you say you're fairly comfortable writing

10   search warrants?

11   A.    Yes.

12   Q.    Do -- what do most of your search warrants that you

13   seek to obtain involve?

14   A.    My primary specialty is parcel intervention.

15   Q.    And have you had training in writing search

16   warrants for parcels?

17   A.    Yes.

18   Q.    Have you trained others in searching parcels or

19   writing search warrants for parcels?

20   A.    Yes.

21   Q.    Directing your attention now specifically to the

22   Willie Fant investigation.  Were you a participant in

23   that?

24   A.    Yes, I was.

25   Q.    Who was the case agent?

UNREDACTED TRANSCRIPT

1   *A.*    He's siting in the front; Special Agent Palazzolo.

2   *Q.*    What was your participation in the -- or role in

3   the Fant investigation?

4   *A.*    Special Agent Palazzolo came to me concerning an

5   investigation he was conducting with Mr. Fant here and

6   had a suspicion that he was receiving particular mailings

7   of narcotics through US mail.  He asked me to review that

8   information for his address.  I placed a mail watch on

9   his address and monitored it for future activity from

10  that point on.

11  *Q.*    What's a -- when you say you "placed mail watch" on

12  the address, first of all, what address?

13  *A.*    It's on Creston.  I'd have to look at the -- I

14  think it's 1001, if my memory serves me correctly.  I'm

15  able to flag addresses for when they receive parcels,

16  based upon weight.  Any particular class of mail I

17  usually -- I select all classes of mail and just monitor

18  all shipment activity through the US Postal Service.

19  *Q.*    And you did that in this case?

20  *A.*    I did.

21  *Q.*    Do you recall during the course of the

22  investigation whether or not this Creston address was

23  receiving a number of packages that rose your suspicion?

24  *A.*    Yes.

25  *Q.*    Do you recall what about it that did?

*EXAMINATION OF ROBERT WEEKS*

1   *A.*     Well, from known source cities for narcotics,

2   California, particularly, weights, prices and postage,

3   and their frequency.

4   *Q.*     Do you recall how many search warrants you wrote

5   for parcels in this case.

6   *A.*     I do believe I wrote three.

7   *Q.*     And do you recall -- well, let's just go -- was the

8   first one on May 3, 2021?

9   *A.*     May I see a copy, please?

10  *Q.*     Yes, sir.

11              **MR. ALLEN:**  May I approach?

12              **THE COURT:**  You may.

13              **THE WITNESS:**   (Reviews document.)

14               This is my signature.  This is my

15  application affidavit request and order to seal.

16  These are all my signatures.  And I did write this,

17  yes.

18              **MR. ALLEN:**  And, Your Honor, just for the

19  record, this is already attached to my original response.

20  It's Record Entry 41, Attachment Number 1.

21              **THE COURT:**  Were you going to make it an

22  exhibit to the hearing?

23              **MR. ALLEN:**  I can today, if -- I didn't know

24  if that would be necessary since I've already filed it on

25  ECF.  But it may make sense.

UNREDACTED TRANSCRIPT

1          **THE COURT:**  Any objection, Mr. Leffler?

2          **MR. LEFFLER:**  No objection.

3          **THE COURT:**  The search warrant is admitted.

4   Exhibit 1.

5          **MR. ALLEN:**  Thank you, Your Honor.

6          (WHEREUPON, a document was marked as Exhibit

7          Number 1.)

8   *BY MR. ALLEN*

9   *Q.*    Have you had a chance to look over that?

10  *A.*    Yes.

11  *Q.*    Do you recall what the basis was for intercepting

12  that bulk of mail?

13  *A.*    Well, after our mail watch was active I would

14  receive heads-up that parcels were coming.  I was able to

15  see that this one was coming from Los Angeles.

16  *Q.*    When you say you get a "heads-up," how would that

17  be a, was it a phone call?

18  *A.*    E-mail.  I usually get an e-mail 24 hours in

19  advance, sometimes sooner, sometimes later.  But I was

20  given well-enough advance to actual seize this parcel and

21  review it.

22  *Q.*    And do you recall seizing that parcel and reviewing

23  it?

24  *A.*    I do.

25  *Q.*    Do you remember what stuck out initially to you

*EXAMINATION OF ROBERT WEEKS*

1    initially about it?

2    A.    Well, if you can turn your attention to Paragraph

3    6, Page 3.  This parcel contained, having originated from

4    a source city for narcotics, handwritten labels,

5    "excessive taping" on the seams, postage, and partial

6    names.

7    Q.    Partial names; let's talk about that a little bit.

8    What -- in your experience as with the postal and DEA,

9    what -- how do names factor into your investigation?

10   A.    Well, due to this nature of shipping stuff back to

11   yourself in a city that you're actually at at certain

12   times.  I usually look for false names, partial names

13   that start with initial/dot/last name.  But in this

14   instance it did say "Will Fant" on the parcel.  So we

15   knew that was his target name.  But coming from that area

16   we wanted to -- decided to go ahead and pull it anyway

17   and just to get a narcotic-seeking detective K-9 in front

18   of it.

19   Q.    So you pulled it first, based on some of

20   the things you said:  Source city, "excessive taping."

21   And then after that you called in a K-9 narcotic?

22   A.    Yes, I detained it and then asked a narcotics K-9

23   to come review that parcel.

24   Q.    Was that K-9 officer -- Bono, with a handler

25   Maliskas, M-A-L- --

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1   A.    Yes, that's correct.

2   Q.    I-S-K-A-S?

3   A.    That's correct.

4   Q.    So you pulled the package first after looking at it

5   and then you have the K-9 alert on that or sniff.  And

6   does it alert?

7   A.    The dog did alert, yes.

8   Q.    And then from that you obtained the search warrant?

9   A.    That's correct.

10  Q.    And did you put all those events that occurred in

11  that search warrant?

12  A.    I did.

13  Q.    Do you remember were you present for the execution

14  of that parcel?

15  A.    Yes.

16  Q.    Was anything in that one?

17  A.    Nothing illegal that we could find.  I think there

18  was clothing items in there in the parcel, so we resealed

19  that parcel and sent it off and did not detain anything.

20  Q.    And did you do a search warrant return on that

21  search warrant and send that back to the Court?

22  A.    Yes.  It was the same day, if I'm not mistaken,

23  dated May 3, 2021.

24  Q.    If I could have those documents?

25          **MR. ALLEN:**  If you wanted to mark this whole

*EXAMINATION OF ROBERT WEEKS*

1   folder, that would be easier.

2              **THE COURT:**  We don't need the folder.

3              **MR. ALLEN:**  You just want --

4              **MR. LEFFLER:**  Gregg, you just want a

5   collective exhibit?

6              **MR. ALLEN:**  Yeah, let's -- I mean, that's fine

7   with me.

8              **MR. LEFFLER:**  Okay.

9              **MR. ALLEN:**  Here's a copy right here.

10  *BY MR. ALLEN*

11  *Q.*    And if I could just -- this is the return.  You

12  said it was done on the same day, and then nothing

13  seized?

14  *A.*    That's it.

15  *Q.*    So the investigation proceeds.  Do you have

16  occasion to get another alert on another parcel?

17  *A.*    From the time we seized this parcel and forward to

18  date, we would receive parcels -- any parcel coming to

19  that address.  We did two other search warrants after

20  that parcel came in.

21  *Q.*    Was the next one on May 11th of 2021?

22  *A.*    May I see the warrant, please?

23  *Q.*    Yes, sir.

24              **MR. ALLEN:**  Permission to approach, Your

25  Honor?

1          **THE COURT:**  Yes.

2          **THE WITNESS:**  (Reviews document.)

3    *BY MR. ALLEN*

4    Q.    Is that the warrant?

5    A.    It is.

6    Q.    Before we go into that do you remember if anything

7    was seized from this one?

8    A.    I'll look at the return here.  It should be 500 and

9    some odd grams of marijuana.

10   Q.    So this one, do you recall getting marijuana?

11         Talk me through the process of this package

12   from what you remember.

13   A.    Correct.  Okay.

14         Again, getting prior notice that the parcel

15   was inbound, right.  So, I said to go review the

16   parcel at the particular Post Office #38127, which

17   is Frayser.  And upon my review -- I can direct

18   your attention to Paragraph 4.  And I noticed that

19   this parcel contained a different name from the

20   actual --

21   Q.    So, Will Fant -- who was this one addressed to?

22   A.    This one is William Fontaine.

23   Q.    F-O-U -- or, F-O-N-T-A-I-N-E?

24   A.    That's correct.

25   Q.    And addressed to Creston Avenue, obviously, because

UNREDACTED TRANSCRIPT

1   you got the alert.

2        What else stuck out to you about it?

3   *A.*   Well, again, we had handwritten labeled "excessive

4   taping" that had postage originating from a source city

5   and state for narcotics.

6   *Q.*   Do you recall the source city on this one?

7   *A.*   That is going to be probably Paragraph 1.

8   Correction.  Paragraph 2.  It would be Riverside,

9   California.  Riverside.

10  *Q.*   And you put in the affidavit that this package was

11  coming from a source city and then the characteristics of

12  it, but you had started to mention the excessive taping?

13  *A.*   That's correct.

14  *Q.*   That's -- what else?

15       Anything else about the actual parcel that

16  stuck out to you when you detained it?

17  *A.*   Well, for this parcel the name -- the name on the

18  address was not what we witnessed in the first one, okay.

19  So, if it had a name like -- of the original like Will

20  Fant -- and, excuse me, I don't know if his proper name

21  is William, Willie, or -- but if it had those variants in

22  there, I probably would have not detained it, as we

23  learned from the previous parcel, a real name going to a

24  real address, we wouldn't have pulled it.  But an alias,

25  that's William or Mr. Fontaine, that was extra probable

*EXAMINATION OF ROBERT WEEKS*

1    cause to proceed with the search warrant application.

2    Q.    Did you know anyone to believe associated with that

3    address that had the name William Fontaine?

4    A.    Not that I could search through database research.

5    I checked MLGW records.  I checked Shelby County law

6    system and I couldn't find anybody with that name there.

7    Q.    And you put in -- do you recall if you put in the

8    search warrant affidavit that that was a false name not

9    associated with that address?

10    A.    That's going to be in Paragraph 5.

11    Q.    So you pulled the package and then what happens

12    next?

13    A.    Same procedure:  Request the narcotics detective;

14    K-9 alerts to it; I ran an application affidavit and

15    submitted it to the judge; and the judge decides whether

16    probable cause is warranted to open the parcel.

17    Q.    And this one was the same K-9 utilized from the

18    previous search warrant?

19         (Simultaneous, unreportable crosstalk.)

20    A.    TFO Andy Maliskas using his K-9 named Bono.

21    Q.    Do you know if the dog alerted on the parcel?

22    A.    He did.

23    Q.    Then you obtained the search warrant, right?

24    A.    That's correct, yeah.

25    Q.    And then after you obtained the search warrant you

1    opened it and that's when you found the marijuana?

2    A.    That's correct.

3    Q.    Let me ask you this.  To your recollection did you

4    have any conversations about the nature of the warrant,

5    specifically, from the previous warrant, that nothing was

6    recovered with the judge while signing this May 11, 2021

7    warrant?

8    A.    I don't believe I did.

9    Q.    Do you recall --

10   A.    I don't recall having a conversation about the

11   previous warrant of the name on the parcel.

12   Q.    And you didn't put in the warrant that nothing

13   was -- or the same K-9 was used the first time and that

14   nothing was discovered?

15   A.    No, I did not.

16   Q.    And there was no conversations with the Court about

17   that, right?

18   A.    No.

19   Q.    After this warrant was obtained and executed did

20   you do a return as well?

21   A.    I did.

22   Q.    Is that up there with you?

23   A.    Yes, it is.  It's dated May 11, 2:15p.m. and the

24   actual weight that we had ascertained from the parcel,

25   which includes wrapping, was 639 grams.

*EXAMINATION OF ROBERT WEEKS*

1          **MR. ALLEN:**  I'd ask that the search warrant

2     packet and the return be the next exhibit.

3               **MR. LEFFLER:**  No objection.

4               **THE COURT:**  Admitted as Exhibit 2.

5               (WHEREUPON, documents were marked as

6               Collective Exhibit Number 2.)

7     *BY MR. ALLEN*

8     *Q.*    I failed to ask you, but on this one do you recall

9     looking at the sender of the parcel as well?

10    *A.*    I did.

11    *Q.*    And do you also look for names related to the

12    address in which the parcel originates?

13    *A.*    Yes.

14    *Q.*    And do you recall on this one anything about the

15    name?

16          If you need to review it --

17    *A.*    I believe it's Paragraph 5.  Yeah, it came back as

18    not valid, or I couldn't see in database searches where

19    anyone utilizing that name was associated with that

20    address.

21    *Q.*    And you also obviously put that in the search

22    warrant as well?

23    *A.*    Yes, Paragraph 5, I believe.

24    *Q.*    So, now you mentioned a third package.  Do you

25    remember obtaining a search warrant for a third parcel?

*EXAMINATION OF ROBERT WEEKS*

1    *A.*    I did.

2    *Q.*    Do you recall what was recovered from that one?

3    *A.*    I'll need to see the warrant, please.

4              **MR. ALLEN:**  Permission to approach?

5              **THE COURT:**  You may.

6              **THE WITNESS:**   (Reviews document.)

7              I was alerted on May 11, 2021.  This is

8    concerning the previous parcel, 639.  They used that

9    as probable cause to monitor the address.

10             Then I received an August 17, 2021 alert

11   for this parcel in question that you're speaking of.

12   And I went through the search warrant process and

13   was able to discover a 283-gram total weight of a

14   white crystalized substance presumptive positive for

15   methamphetamine.

16   *BY MR. ALLEN*

17   *Q.*    And talk me through this package.  So, you get the

18   alert again.  This is -- who is this parcel addressed to?

19             Is it a false --

20   *A.*    A William Fontaine.

21   *Q.*    William Fontaine?

22   *A.*    And I assume I'm pronouncing that correctly,

23   "Fontaine."

24   *Q.*    And that was the same one as the May 11th that we

25   were just talking about, the same name, William Fontaine?

*EXAMINATION OF ROBERT WEEKS*

1    *A.*     Correct.

2    *Q.*     You knew at that point in your investigation that

3    name was associated with the address?

4    *A.*     From my previous seizure I associated that name

5    with a receiver of narcotics based upon that alias.

6    *Q.*     Thank you.

7         The parcel was seized.  What -- do you

8    recall what stuck out about this one when it was

9    originally detained?

10        Obviously, the fake name, but was there

11   other -- was this one from a sourced city?

12   *A.*     It was.  Paragraph 2, also from Riverside,

13   California.  So we have a second parcel coming from the

14   same area to a variation or almost the same alias as we

15   identified before.  It was one pound two ounces.  So ...

16   *Q.*     So you pulled -- well, let me ask you this first.

17   Who was that one from?

18        Was that from a name you were able to

19   associate with the sending address?

20   *A.*     Let's see here.  Yeah, a Lester White from a 2141

21   Rancho Drive.  I couldn't identify that person as well.

22        Paragraph 6.

23   *Q.*     And then you obtained the parcel.  You used a

24   different K-9 officer at this time.  Was this Roxy with

25   Gross, Officer Gross?

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1   A.   Jonathan Gross, correct.

2   Q.   And do you recall if the dog alerted on the parcel?

3   A.   Yes.

4   Q.   And did you put all that information in your

5   affidavit?

6   A.   Yes.

7   Q.   And then you obtained the search warrant that you

8   have there in your hand?

9   A.   Correct.

10   Q.   And then you executed and you recovered suspected

11   methamphetamine?

12   A.   Yes.

13          **MR. ALLEN:**  I ask that that search warrant be

14   the next exhibit, Exhibit 3, please.

15          **MR. LEFFLER:**  No objection.

16          **THE COURT:**  Admitted as Exhibit 3.

17          (WHEREUPON, a document was marked as Exhibit

18          Number 3.)

19   *BY MR. ALLEN*

20   Q.   Special Agent Weeks, what happened next in the

21   investigation?

22   A.   I also wrote a search warrant for an anticipatory

23   controlled delivery -- an anticipatory search warrant for

24   that address for a controlled delivery of that last

25   parcel that contained the methamphetamine.  We replaced

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1   that drug with sham.

2   Q.   Was an "anticipatory search?"

3   A.   So, when we find narcotics of interest as in the

4   methamphetamine in this case, we will undercover-deliver

5   that parcel to the address utilizing an undercover agent

6   and obtain -- or to see if that parcel will go into the

7   house.  And that would make our anticipatory search

8   warrant valid to search the home for evidence of a crime.

9   Q.   Now, in this case, the recipient was a

10  William Fontaine?

11  A.   Uh-huh (affirmative).

12  Q.   And you had mentioned that that was not a name that

13  was originally associated with the address, but as you

14  said, someone -- a recipient of parcels was using that

15  name at that address, right?

16  A.   That's correct.

17  Q.   So how does that work when you have a package to a

18  fake name that's going to an address?

19  A.   We deliver to addresses.

20  Q.   Okay.

21  A.   So, we don't deliver to a specific person.  We

22  deliver to the address itself.  So, it didn't have a

23  signature requirement on it, okay.

24       So the person that would be using that name

25  did not sign their name to it.  It was --

*EXAMINATION OF ROBERT WEEKS*

1    basically, our duty was to drop the package to the

2    address and stamp it as delivered.

3    *Q.*    And your understanding for this search of the

4    residence to trigger that was that the parcel had to

5    what?

6    *A.*    Be accepted and taken inside the house through the

7    threshold of the house.

8    *Q.*    And if the package never goes into the address what

9    do you do?

10   *A.*    Our search warrant's not valid.

11          **MR. ALLEN:**  I'd like to pass forward this next

12   warrant and let you take a look at that.

13          **THE COURT:**  You may approach.

14          **THE WITNESS:**  If the parcel ever goes into the

15   residence we have a couple of options:  We leave it

16   because we took the actual narcotics out and it's got

17   sham material in it, which would jeopardize the

18   investigation; we can go recover it and speak to the

19   homeowner; or we can just continue to wait and wait and

20   see if anybody actually shows up.  So, those are our

21   options.

22   *BY MR. ALLEN*

23   *Q.*    But in this case do you recall what happened?

24   *A.*    I was not actually witnessing.  I was listening

25   over the radio because I was providing protective cover

*EXAMINATION OF ROBERT WEEKS*

1    for our undercover agent.  But he did tell me that

2    someone at the house came to the front porch, or somebody

3    over radio traffic was monitoring that house at that

4    point.

5           So, once our UC delivers that parcel, it's

6    for the person that has the eye on the house to say

7    whether it goes in or not.  They have to see it go

8    in.

9    Q.    If you would take a look at that search warrant and

10   tell us a little bit about what you detailed in that one.

11   A.    In our probable cause I list the case history for

12   the case; the previous narcotic seized; the reason why we

13   had it under observation in the first place; and all the

14   events that lead us to the point of actually applying for

15   an anticipatory for the residence, based upon the last

16   parcel we seized.

17   Q.    So included in that search warrant is the previous

18   August 17, 2021 search warrant where you recovered

19   methamphetamine?

20   A.    Yes.

21   Q.    And then the -- you also put a clause or a trigger

22   and condition in the warrant, right, that's kind of what

23   you were talking to us about earlier?

24   A.    Correct.

25   Q.    And what is that in this specific warrant?

1    *A.*    I'll have to look for it for you, just, if you

2    could bear with me for a minute.

3    *Q.*    Yes, sir.

4    *A.*    Okay.  Page 8, Line 16.  This warrant will only be

5    executed following successful controlled delivery of USPS

6    Express Mail Parcel EJ914427867 US.

7    *Q.*    So that's the triggering conditions that you put in

8    the search warrant?

9    *A.*    Correct.

10   *Q.*    And when the briefing happens before this

11   anticipatory search warrant goes on, do you or other

12   individuals there explain this?

13   *A.*    Yes.

14   *Q.*    So, someone that's not familiar with executing

15   anticipatory search warrants or parcels would know they

16   can't just search the residence unless this triggering

17   conditioning happens?

18   *A.*    That's correct.

19         **MR. ALLEN:**  If that can be the next exhibit,

20   Exhibit 4, please.

21         **THE COURT:**  Okay.

22         **MR. LEFFLER:**  No objection.

23         **THE COURT:**  Admitted.

24         (WHEREUPON, a document was marked as Exhibit

25         Number 4.)

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1    *BY MR. ALLEN*

2    Q.    And, Special Agent Weeks, in this one, you did not

3    in this specific warrant, you didn't list the first

4    search warrant that was recovered where only clothes were

5    found, correct?

6    A.    Not to my memory, I don't think that I did.

7    Q.    And why would you not include that in your

8    affidavit?

9    A.    Well, because we're doing narcotics investigation

10   and after our experience with detaining and searching a

11   parcel address of the actual homeowner, we stopped

12   focusing on parcels that would have that name on it.  So

13   we only focused on parcels that had aliases known to us,

14   but not listed as an actual person living there, such as

15   Will Fant, Willie Fant, Fant.

16   Q.    And you're obviously not a trained K-9 handler,

17   right?

18   A.    No, sir.

19   Q.    How many search warrants have you participated

20   utilizing a K-9?

21   A.    For narcotics packages, all of them.

22   Q.    So, when -- if I say the phrase, "Alert to the

23   presence of the odor of narcotics," what does that mean

24   to you?

25   A.    Well, if the narcotics K-9 does detect in that

UNREDACTED TRANSCRIPT

1  instance it means that something's been in the parcel,

2  been around the parcel.  In this case where we didn't

3  seize anything, clothing could have been exposed to the

4  air of narcotics, such as smoke, powders, anything that

5  would have been an odor that a narcotics detective K-9

6  could recognize and possibly pick up on those transfers.

7  Q.    Did you participate in the actual search of 1001

8  Creston?

9  A.    I did after-the-fact, yes.

10  Q.    Do you recall if Mr. Fant was present at the

11  residence?

12  A.    No, he was not.

13  Q.    Do you recall after you searched the residence,

14  anything that you recovered, narcotics-related?

15  A.    I do remember in the bedroom where the parcel was

16  found there was small amounts of white powdered substance

17  or white crystalized substance.

18  Q.    Do you recall if a pill press was found?

19  A.    It was found in one of the adjacent rooms in a

20  corner.  I think it was the corner opposite of the door.

21        **MR. ALLEN:**  That's all the questions I have.

22        **THE COURT:**  Cross-examination?

23        **MR. LEFFLER:**  Your Honor, may we take a

24  bathroom break before I get started?

25        **THE COURT:**  Yes, we can.  Take a short recess.

*EXAMINATION OF ROBERT WEEKS*

1    **CASE MANAGER:**  All rise.  This Court's now in

2    recess.

3              (Short break.)

4         **THE COURT:**  Looks like everyone is back.

5              Mr. Leffler, you may proceed with your

6    cross-examination.

7         **MR. LEFFLER:**  Thank you, Your Honor.

8

9                    <u>**CROSS-EXAMINATION**</u>

10   QUESTIONS BY MR. LEFFLER:

11   *Q.*    Mr. Weeks, you, early on in your testimony, you

12   mentioned a "mail watch."  Is that also known as a "mail

13   cover?"

14   *A.*    No, it's not.

15   *Q.*    What's the difference?

16   *A.*    A "mail cover" is a documented recording of all

17   parcels, all first class letter mail.  It's a copy.

18        A "mail watch" is to show historical, like,

19   who is receiving mail at this particular location.

20   A "mail watch" is different.  That's an internal

21   mechanism that I can use to let me know that a

22   parcel is coming.

23        So, a "mail watch" is a copy of the front of

24   labels submitted to us by either a postmaster, a

25   supervisor, or somebody that they deem responsible

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1    for making covers -- a copy of each parcel, and

2    submitting that to me in a 30-day -- usually a

3    30-day report.

4    Q.    And do you keep records of the mail watch of things

5    you receive pursuant to the mail watch?

6    A.    They're shipped to me in an e-mail form.  But my

7    e-mail expires, I think, or it recycles itself every 60

8    days, so ...

9    Q.    So what does that mean?  I don't understand.

10   A.    Those are e-mails.  So, my e-mail system does not

11   keep anything older than, like, 60 days.  So I don't keep

12   record of the actual e-mail mail watches that are sent to

13   me.

14   Q.    But when you receive one of these mail watches --

15   A.    Right.

16   Q.    You receive something in the form of an e-mail?

17   A.    That's correct.

18   Q.    Does it have a photograph of a package?

19   A.    No, it does not.

20   Q.    What data does it have on it?

21   A.    It has -- you have a package alerted to the address

22   that you asked for it to be sent to, coming from this

23   area.  It will give the address, the weight, and the

24   origination of where it's from.  That's it.

25   Q.    And that's all -- it has all the information that's

1  on there?

2  A.    That's all I would need, yes.

3  Q.    How many of these mail watches did you receive

4  during the course of this investigation?

5  A.    Just for your client alone?

6  Q.    Yes.

7  A.    I'm not certain at this time.  I don't know.  I can

8  go back and pull the actual total parcel history.  We can

9  establish from when I set it up until the time it ended

10  and discount the parcels in between.

11  Q.    Would you keep it by address?

12  A.    Can you clarify; keep what?

13  Q.    You said just to my client alone.  I'm not sure

14  what the alternative would have been.

15  A.    Just to the address that was identified.

16  Q.    So the client or the address?

17  A.    The address.

18  Q.    The address?

19  A.    The address.

20  Q.    So whatever's coming to 1001 Creston you would find

21  out what the weight of that was?

22  A.    Correct.

23  Q.    What the source city was?

24  A.    Correct.

25  Q.    But that's it?

*EXAMINATION OF ROBERT WEEKS*

1    A.    That's correct.  Unless I went and investigated

2    myself and put hands on a parlor or was somehow able to

3    pull a scan from our automated system that our processes

4    will take sometimes.

5    Q.    And what do you have to do to get authority to

6    request a mail watch?

7    A.    Via postal inspector, which I am.  We submit it

8    through our national intelligence service center and they

9    provide those to us, or they set those up.

10   Q.    Is this -- are there are internal regulations for

11   how the mail watch is used?

12   A.    Can you be more specific?

13   Q.    I'm looking for something in the postal records

14   that show what your authority is for asking for a mail

15   watch.

16   A.    My authority is a law enforcement agent.

17   Q.    I'm asking is there a document that explains that

18   to us.

19   A.    My credentials.

20   Q.    The Code of Federal Regulations has a provision for

21   mail covers, 39 --

22   A.    Mail cover is correct.  This is a mail watch.

23   Q.    Correct.

24   A.    We're talking about two different things here.

25   Q.    But under what authority is a mail watch

1    authorized?

2    *A.*    A statute?

3    *Q.*    Yes.

4    *A.*    I'll have to find that for you.

5    *Q.*    Okay.  Could you please find that and produce it to

6    the Government so that they can -- we can include that as

7    a late-filed exhibit in the case?

8    *A.*    If it pleases the Court.

9                **THE COURT:**  Mr. Allen?

10               **MR. ALLEN:**  I think this is what Mr. Leffler

11   has mentioned previously before we started.  I'll gladly

12   work with him, or if special agent -- or Inspector Weeks

13   gets me anything, we'll include that, Judge.

14               Are we including any regular regulations

15   or anything within the postal regarding this mail

16   watch or ...

17               **THE WITNESS:**  Cover.

18               **MR. ALLEN:**  Watch.

19               **THE WITNESS:**  No, watch.  You're correct.

20   It's not a cover.

21               **MR. ALLEN:**  Mail watch, yes, sir.

22               **THE COURT:**  Thank you.

23               **MR. LEFFLER:**  Thank you.

24               (WHEREUPON, a document was designated to be

25               marked as Late-filed Exhibit Number 8, when

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1          provided.)

2   *BY MR. LEFFLER*

3   Q.    This going over the discovery that I was provided,

4   it appears that this investigation began in early April

5   of 2021.  Would you agree with that?

6   A.    I would say that's accurate from my recollection.

7   Q.    And it began with a notification that an

8   encapsulating machine had been mailed to 1001 Creston

9   Avenue in Memphis; is that correct?

10  A.    You're using the term "Mailed."  I'm uncertain if

11  it was U.S. mail, FedEx, UPS.

12  Q.    All right.  Specifically, it says, "Shipped."

13  A.    Okay.

14  Q.    Does that help you at all in answering the

15  question?

16  A.    What is your question, sir?

17  Q.    The question was:  Did you get -- did this begin

18  when you determined that an encapsulating machine was

19  shipped to 1001 Creston Avenue in Memphis?

20  A.    From the agent in charge of this investigation, his

21  conversations with me on the background of the start of

22  this investigation, that's correct.

23  Q.    That he was the one that informed you --

24  A.    That's correct.

25  Q.    Of the shipment of the encapsulating issue?

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1   A.    Correct.

2   Q.    Also known as a pill press?

3   A.    Yes.

4   Q.    And did you understand that it was mailed to Dirty

5   Life Clothing at the Creston address?

6   A.    I don't remember.

7   Q.    And so, you've been investigating controlled

8   substances and their trafficking for nine years, or more

9   than nine?

10   A.    In the beginning of my career I was assigned to

11   mail theft, so I would say I've been in the narcotics

12   investigative portion of my job for about six.

13   Q.    Six years?

14   A.    Correct.

15   Q.    And in those six years do you have any -- did you

16   gain any knowledge of how users of marijuana typically

17   consume the marijuana?

18   A.    Yes, this -- through common source information.

19   It's very common how people use marijuana.

20   Q.    How?

21   A.    Media.

22   Q.    No, no, no, no.

23   A.    My experience.

24   Q.    No.

25         What is the mechanism by which they get the

*EXAMINATION OF ROBERT WEEKS*

1    marijuana in their system usage?

2    *A.*    The ways they ingest it?

3    *Q.*    Correct.

4    *A.*    You can smoke it.  You can eat it.  I don't know of

5    any other way.  I'm not an expert in marijuana, so I

6    mean, as a user, I don't -- I couldn't tell you all the

7    cool new ways that people use marijuana now.  I just

8    don't know.

9    *Q.*    Have you ever heard of people putting marijuana in

10    pills?

11    *A.*    Not that I know of.  I've never heard of anybody

12    pressing marijuana pills in tablet form.

13    *Q.*    Let me ask you the same question with regard to

14    methamphetamines.  How is that usually consumed?

15    *A.*    Smoked.  You can ingest it.  I believe you can

16    snort it.  And I think you're getting to the question of:

17    Can you encapsulate methamphetamine?

18    *Q.*    Right.  Can you?

19         I'm not asking so much as, can you, as I'm

20    asking, is that something that's done?

21    *A.*    Yes.

22    *Q.*    All right.  How prevalent is that; encapsulating

23    methamphetamines?

24    *A.*    I don't come across it too often.  This day and age

25    we're mostly looking at fentanyl.

UNREDACTED TRANSCRIPT

1   Q.    I understand on April 14 that surveillance was set

2   up on Mr. Fant's house, both at 47- -- well, at two

3   locations.  Are you familiar with 4746 Bradford Drive?

4   A.    I was briefed on that address, correct.

5   Q.    And whose address is that as far as you know?

6   A.    If my memory serves me correctly, I think it was a

7   relative, maybe a father.

8   Q.    And then surveillance was also set up at 1001

9   Creston Avenue.  Whose address is that?

10  A.    I believe, Mr. Fant's.

11  Q.    Now, were suspicious packages going to both of

12  those locations and that's why surveillance was set up?

13  A.    It was brought to my attention that both addresses

14  needed to be monitored, but during the time, my memory

15  can't -- I can't recall at this moment whether we saw any

16  or we just didn't have the opportunity to seize anything

17  from the other address.

18  Q.    From the other address, meaning the Bradford

19  address?

20  A.    That's correct.

21  Q.    Why was it being surveilled if you didn't have any

22  indication that there were illegal shipments being made?

23  A.    Why was it being surveilled?

24  Q.    Right.

25  A.    Just because of the nature of the case that was

*EXAMINATION OF ROBERT WEEKS*

1    briefed to me that he may be frequenting the house.

2    *Q.*    That Mr. Willie Fant may be frequenting the house?

3    *A.*    That's correct.

4    *Q.*    Did you ever conduct surveillance yourself at

5    either the Bradford address or the Creston address?

6    *A.*    No.

7    *Q.*    Let's go back to these pill presses or

8    encapsulating machines.

9         Do you -- are you aware that those are often

10   used by herbalists to encapsulate herbal products?

11   *A.*    I would assume that they can be used by herbalists.

12   I assume so.

13   *Q.*    And that would be a perfectly legitimate use for a

14   pill press, correct?

15   *A.*    Yeah, I assume so.  I don't have much experience

16   pressing herbal pills or pills in general.  I'm trying to

17   give you the best answer possible, but ...

18   *Q.*    So there wouldn't be anything illegal about an

19   herbalist putting legal herbs in pill form?

20   *A.*    Not to my knowledge.

21   *Q.*    And that would not arouse the suspicion of the

22   postal service, correct?

23   *A.*    No, sir, it wouldn't.

24   *Q.*    On the -- I'm going to go to the search warrants

25   for the packages and ask you some questions about that.

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1           In looking at the May 3rd affidavit --

2              **MR. LEFFLER:**  May I put that in front of the

3  witness, Your Honor?

4              **THE COURT:**  Yes, we have one up here.

5  *BY MR. LEFFLER*

6  *Q.*    I'm going to ask you some questions about that,

7  Mr. Weeks.

8  *A.*    Okay.

9  *Q.*    On Page 2 of the affidavit, Paragraph 4.

10  *A.*    Yes.

11  *Q.*    The first sentence says, "Memphis-based narcotic

12  trafficker and manufacturer currently living" -- I'm

13  sorry, I'll back up.

14      On or about April 8th of 2021 your affiant

15  was contacted by task force officers or DEA Group 2

16  concerning a Memphis-based narcotics trafficker and

17  manufacturer currently living at 1001 Creston.

18      Would that have been referring to Willie

19  Fant?

20  *A.*    Yes.

21  *Q.*    And what evidence did you have at that time where

22  he was trafficking in narcotics?

23  *A.*    They briefed me on why they wanted the assistance

24  of the United States Postal Inspection Service, so ...

25  *Q.*    "They" being who?

*EXAMINATION OF ROBERT WEEKS*

1  A.    They explained it to me -- task force officers for

2  DEA.

3  Q.    And did you know whether or not he had any prior

4  criminal history connected with narcotics trafficking or

5  manufacturing?

6  A.    No, I did not.

7  Q.    Do you know what evidence they had that he was a

8  narcotics trafficker or manufacturer as of April 8th of

9  2021?

10 A.    I didn't.  I didn't -- did not.

11 Q.    You indicated that it was suspected that he

12 received opioids from Los Angeles/Riverside, California

13 area.  Was that information that was given to you or was

14 that something that you determined on your own?

15 A.    Is that still Paragraph 4, page --

16 Q.    Still Paragraph 4, the next sentence.

17         TFOs informed your affiant, their main

18 target, Willie Fant, was suspected of receiving

19 opioids from Los Angeles/Riverside, California

20 area.

21 A.    Right.  That was the initial suspicion, that he was

22 pressing opioid pills, using a pill press.  That was the

23 statement that was made, suspected of opioid processing.

24 Q.    And you didn't have any independent verification of

25 that, other than what you were told, right?

1    A.    Correct.

2    Q.    And then the next page, Page 3, Paragraph 6.  On

3    May 3rd your affiant received an alert that the subject

4    parcel had arrived at the Frayser post office in Memphis.

5          I take, you're the affiant, correct?

6    A.    That's correct.

7    Q.    And who alerted you?

8    A.    That the parcel was inbound?

9    Q.    Who alerted you that the subject parcel had arrived

10   at the Frayser postal office?

11   A.    Oh, internal postal tracking data.

12   Q.    Okay.  So you weren't given -- you weren't

13   contacted by a person?

14   A.    No.  I can plainly see in our intranet tracking

15   system, I see what's coming, I can track the progress and

16   see where it's at.  So my alert was my actual looking at

17   our product-tracking system.

18   Q.    Now, in this particular package when you looked in

19   that tracking system you could see the name of the

20   recipient and the name of the sender?

21   A.    Not always.  Sometimes I can.  Sometimes I can't.

22   Because if it goes through our package scanning machines,

23   they're moving very fast.  So sometimes I do get an

24   image, just based upon our equipment that the postal

25   service equipment does.  Sometimes I don't.

*EXAMINATION OF ROBERT WEEKS*

1          Let me see here.  No, I think I actually

2     witnessed this one in person.

3     Q.    You witnessed what in person?

4     A.    The label information.

5     Q.    The label information?

6     A.    Right.

7     Q.    And how did you access that information?

8     A.    Like, through my computer or my cellphone, I can

9     access databases through both.

10    Q.    And it showed --

11    A.    I have an analyst that I can relay information back

12    to.

13    Q.    Do you recall that it showed Will Fant was on both

14    ends of the shipment?

15    A.    If I can remember correctly.  I would have to see

16    an actual picture of the parcel if you have it available.

17          Well, I think it might be in Paragraph 2,

18    actually.

19    Q.    I think it's in another paragraph.

20    A.    I would check Page 1, probably Paragraph 2.  Yeah,

21    Will Fant, was -- "Will F.," that was the parcel.  Yeah.

22    The parcel or the partial initials of a name.

23    Q.    Is that suspicious?

24    A.    It can add to my suspicion, yes.

25    Q.    And why is that?

1    A.    Because I've seen it in my experience of doing this

2    where I've seen people use a name on one end or the other

3    that could separate themselves out.  Okay.

4          And I also see a person sending to a person.

5    That's another indicator that it could be narcotics

6    trafficking because -- based upon what I know -- my

7    experience.

8    Q.    Tell us about your experience.

9    A.    Okay.

10   Q.    I want to know why that was suspicious.

11   A.    Why that was suspicious?

12   Q.    Yeah.

13   A.    A name from an area, to a like or same name, to the

14   same area, as someone mailing something to themselves

15   that they do not want to carry with them.  That's my

16   experience.

17         And I have also seized other parcels in my

18   career where this was a common place.  So, a name

19   to a name.  Okay.  It's not the end all be all of,

20   like, my suspicion, but it does add to the totality

21   of it.

22   Q.    And then it says on Page 3, Paragraph 6, again, you

23   give the characteristics and you said a handwritten label

24   is one of characteristic of what may be a prohibited

25   substance in the package.

*EXAMINATION OF ROBERT WEEKS*

1          Why is whether a label handwritten or typed,

2     either suspicious or not suspicious?

3     *A.*     Well, because it's not coming from a manufacturer.

4     It's not a professional label.  It's actually printed

5     from a manufacturer to an addressee.

6          Usually, legitimate businesses don't have

7     handwritten labels.  They print them out.  And like

8     I said, that enough, alone, wouldn't raise my

9     suspicion enough to actually quarantine the parcel,

10    neither would, like, just the single name.  It has

11    to have a multitude of reasons of suspicion for me

12    to delay a piece of US mail unreasonably.

13         But those things added up for me enough to

14    pull it off and seek further investigation from a

15    K-9.

16    *Q.*     Well, you also mentioned that the partial names

17    listed on the return address are suspicious.  What makes

18    a partial name on a return address suspicious?

19    *A.*     It doesn't list the entire name.  Okay.

20    *Q.*     Why would that be suspicious?

21    *A.*     Because if the parcel was "return to sender" or we

22    actually -- okay.  And it's not in this instance, but in

23    other drug parcels that I've obtained, drug shippers will

24    use that partial name in case it ever comes back to them,

25    they'll separate themselves out.  Okay.  So that's one

*EXAMINATION OF ROBERT WEEKS*

1    reason that they could do that.  But I'm not saying

2    that's applied in all instances.  It's just very common.

3    Q.    And then excessive tape along the seams, you said

4    that was suspicious.

5          Why would excessive tape be suspicious?

6    A.    Because that will seal the parcel better, to not

7    emit odor, in some instances, or spill out, or for

8    evidence tampering so if I get into it.  So, taping along

9    the seams, heavy taping is one -- a very good indicator

10   for me.

11   Q.    But innocent people could tape on excessively as

12   well --

13   A.    Sure.

14   Q.    If they didn't want it breaking open.

15   A.    Sure.

16   Q.    Then is excessive postage, you've mentioned that as

17   being suspicious.

18   A.    Uh-huh.

19   Q.    Why is that suspicious?

20   A.    Because if you use higher dollar postage and you

21   got other options, you want something that's very

22   important to you to get there very quickly.  Okay.  And

23   like I said, not in all instances is high dollar postage

24   an indicator of narcotics trafficking.  It's just one of

25   those factors that I look for.  Okay.

*EXAMINATION OF ROBERT WEEKS*

1  Q.    Innocent people could want the same thing.

2  A.    Oh, sure.

3  Q.    Or they may not have the ability to weigh a package

4  and know exactly how much to put on.  So they slap on

5  what they think is going to be enough and have it get

6  there, correct?

7  A.    Not in this instance.  This was over the counter.

8  This was paid for from a clerk.

9  Q.    Okay.  All right.

10 A.    Yeah.

11 Q.    So, but they want to know their package is going to

12 arrive.  And perfectly innocent people would want to

13 know --

14 A.    Oh, sure.  Of course.

15 Q.    You finally say, originating from a source city or

16 state for narcotics.  And we know that these packages

17 were coming from California.

18       Why would California be any more sourced

19 than any place else?

20 A.    Well, I don't want to get too much into the weeds

21 on this, because I could go on for days.  But it is

22 accessible to a border that's got holes in it.  These

23 drug are trafficked through the southern border.

24 Marijuana is legal in California.  Some drugs are legal

25 in California.  It is just a very common place for where

*EXAMINATION OF ROBERT WEEKS*

1    I see narcotics originate from.

2    Q.    It's also the most popular state in the country,

3    correct?

4    A.    Uh-huh.

5    Q.    And -- is that a "yes"?

6    A.    It is.

7    Q.    And it's quite a tourist destination, correct?

8    A.    I would think so.

9    Q.    Now, you said that Bono, the dog, alerted on the

10   package.

11        Were you present when that happened?

12   A.    Yes.

13   Q.    Where did it take place?

14   A.    I can't remember.  I can't remember the exact

15   location that he alerted at.  We do so many.  You have to

16   -- you'll have to consult with the K-9 owner for that

17   one.  I just can't remember.

18   Q.    Do you remember how many parcels were set out for

19   the dog to consider?

20   A.    I don't, but usually when we do that we conceal it

21   inside different parcels in the room.  It's definitely

22   more than three.  So if we use our -- like, our office

23   supply room where there should be no narcotics, there's

24   several boxes in there.  If we use our garage, we can put

25   it behind a trashcan, just a variety -- we try to avoid

1   that.  We try to make it as difficult as possible for a

2   K-9 to alert to it, that way we're more certain in our

3   efforts to have a better understanding.  We don't make it

4   easy for them.

5   Q.   Obviously, this one wasn't easy for them, because

6   they alerted on something that didn't have anything

7   illegal in it.

8   A.   That's correct.  We didn't find anything illegal in

9   it.  We just -- we can't determine what the contents were

10  exposed to prior to shipment.

11  Q.   And I've often heard that in any law-abiding

12  citizen's wallet, they have some cash in there and there

13  may be some traces of illegal substances on that cash

14  that they have nothing to do with.

15  A.   Right.

16  Q.   Would you agree with that?

17  A.   I would agree with that.

18  Q.   So then, what's the real advantage to having a dog

19  search a package if the dog will alert on traces of

20  things that could be there for no illegal reason?

21  A.   I wish I could explain why a dog does what it does.

22  But his nose is a lot powerful than ours and they're

23  trained very meticulously.  And I've had very few times

24  where that was the case, but it does happen.

25  Q.   Were you surprised this time when it happened?

*EXAMINATION OF ROBERT WEEKS*

1   *A.*    I wouldn't say "yes" and I wouldn't say "no."  And

2   I know why you're asking that.  And that's reason, going

3   forward, I wouldn't pull, or we would not detain or seek

4   further searches for a parcel that contained Mr. Fant's

5   real name, okay, because we had that dog alert on that

6   parcel.

7        So that changed kind of the way I would be

8   more discriminant in these parcels.  When I saw the

9   aliases coming through, that's when I knew that it

10  had a higher chance of being narcotics than the

11  first time we pulled clothes that may have been

12  exposed to narcotics odor.

13  *Q.*    I want to ask you about something you said

14  previously.  This is part of the -- let's see if I can

15  make that look any better for you (indicating exhibit).

16  *A.*    I can see it.

17  *Q.*    I want to ask you about something you've written at

18  the bottom -- well, identify this document for us,

19  please.

20  *A.*    That's the application for a search warrant.

21  *Q.*    Okay.  And is that application prepared by you or

22  was it prepared by somebody else?

23  *A.*    It's prepared by me.  It's overlooked by the

24  cooperating attorney.

25  *Q.*    All right.  And I notice at the bottom it says,

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1    "Attested to by the applicant in accordance with the

2    requirements of Federal Rules of Criminal Procedure

3    44.1."

4         You see where it says that --

5    *A.*    Yes.

6    *Q.*    At the bottom?

7    *A.*    Uh-huh.

8    *Q.*    And then it says -- and what does it say after that

9    in the blank space?

10   *A.*    "By telephone and e-mail."

11   *Q.*    Right.

12        And so, did you write "telephone and e-mail"

13   on there?

14   *A.*    Not to my -- no, I -- no.  If you scroll back up it

15   says, "Application for warrant by telephone or other

16   reliable and electronic means."

17   *Q.*    Right.

18   *A.*    So this is a telephonic warrant/application, which

19   means we contact the judge via telephone.

20   *Q.*    Okay.  And this was on May 3rd, correct?

21   *A.*    05/03/2021.

22   *Q.*    And this was the return on it, correct, where you

23   said nothing was seized?

24   *A.*    Uh-huh.

25   *Q.*    Is that a "yes"?

*EXAMINATION OF ROBERT WEEKS*

1    A.    That's correct.

2    Q.    We need to have verbal answers.

3    A.    Yes, nothing was seized in this parcel.

4    Q.    And when -- did you ask for a delayed notification?

5    A.    Yes.

6    Q.    What does that mean, "delayed notification"?

7    A.    So, if we were to seize property from someone they

8    have a right to be informed within a certain amount of

9    time that deems reasonable.  So this is an ongoing

10   investigation.  We did not want a notification saying

11   that a parcel was detained or a parcel was not detained,

12   whatever, going to the address and then mentioned because

13   it would tipoff our investigation.

14   Q.    And so, was this delayed?

15   A.    There was a motion to seal application and then we

16   have information application was delayed, notice granted

17   by Judge Pham, yes.

18   Q.    And what does that mean when it's delayed?

19   A.    You don't give an immediate notice of this warrant.

20   Q.    You don't give who immediate notice of this

21   warrant?

22   A.    The address.

23   Q.    Does the Court get immediate notice of the warrant?

24   A.    I'm confused by you're question.  Do they get

25   immediate notice of the warrant that I'm approaching the

96

*EXAMINATION OF ROBERT WEEKS*

1   Court with?

2   *Q.*    No.  I'm saying, does the Court get immediate

3   notice that the search came back with nothing seized?

4   *A.*    Well, it's in the return when I return it, yeah,

5   for sure, yes.

6   *Q.*    Well, if you return it, if you find something in

7   it, do the Courts get notice that something's been

8   seized?

9   *A.*    Yes.

10   *Q.*    And at what point do they receive that?

11        Do they receive it separate from the

12   affidavit?

13   *A.*    Then they get the return.  They get the search

14   warrant returned.  They already have a signed copy of

15   the application.

16   *Q.*    This is a search warrant returned, correct?

17   *A.*    That's correct.

18   *Q.*    Are there any other documents involved in the

19   return, other than this one piece of paper we're looking

20   at?

21   *A.*    I can usually put the front of it back on there,

22   but they've already got that signed copy.  They've --

23   what you're asking is, they already have the copies to

24   all this, except for that executed return.  They send me

25   those copies.  This is the only copy that's not completed

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1   until we get done.  So this is the return.  Okay.

2   Q.   Let me get that back from you.

3   A.   Yes, sir.

4          **MR. LEFFLER:**  Can I get the May 11th (talking

5   to cases manager)?

6          **THE CASE MANAGER:**  Sure.

7   *BY MR. LEFFLER*

8   Q.   This is the May 11th affidavit.  And on Paragraph 2

9   of Page 1 it says that it was addressed to Willie

10   Fontaine, 1001 Creston Avenue, correct?

11   A.   Correct.

12   Q.   And that the return address was Kevin Whitehead,

13   2060 Rancho Drive, Riverside, California, correct?

14   A.   I'm sorry --

15   Q.   It's in that same paragraph on Page 1.

16   A.   Yes.

17   Q.   And when you saw the name, Willie Fontaine, did you

18   think that that was referring to a Willie Fant?

19   A.   I considered it to be a variation for a close

20   proximity of his name, but it still appeared to me to be

21   an alias, yes.

22   Q.   But an alias would be, Willie Fant, correct?  It's

23   just using a different name.

24   A.   Would Willie Fant be an alias, is that what you're

25   asking me?

1   Q.    No, no, no.  You're saying you saw Willie Fontaine

2   as being an alias, correct?

3   A.    Well, a false name.

4   Q.    A false name, sure.

5   A.    A false name, yeah.

6   Q.    But who do you think the actual recipient was

7   supposed to be, if not Willie Fontaine?

8   A.    Well, we were investigating Willie Fant.

9   Q.    So that's where you supposed in reality to go,

10  regardless of this name, Willie Fontaine?

11  A.    Yes.

12  Q.    It was on its way to Willie Fant, correct?

13  A.    That was our suspicion, yes.

14  Q.    And you did a check on Kevin Whitehead to see if

15  that name was associated with the 2060 Rancho Drive; is

16  that correct?

17  A.    Yes.

18  Q.    And you found that it wasn't, correct?

19  A.    I could not find any record.

20  Q.    All right.  Did you check on 2060 Rancho Drive or

21  did you check on Kevin Whitehead?

22  A.    I checked on the address.

23  Q.    Okay.  So, if --

24  A.    I'm sure there's a Kevin Whitehead somewhere in the

25  world.  But, I mean, I was just going back to the

1    address.  I utilized CLEAR for that.

2    Q.    You used what?

3    A.    Our database system is referred to as "CLEAR."

4    Q.    All right.  What is that?

5    A.    It's just a database used by law enforcement to

6    cross reference names, telephone numbers, addresses,

7    vehicles.

8    Q.    But if Kevin Whitehead wanted to know that -- if

9    Kevin Whitehead was not convinced that it was returned to

10   him he would get it at his regular address and wanted to

11   use another address that someone had allowed him to use,

12   that could have been innocent, correct?

13   A.    For someone to be using an address with their name

14   on it, that doesn't have an association with them, is

15   that what you're asking me?

16   Q.    Yeah, right.  So --

17   A.    Sure.  I'm mean, you can.

18   Q.    Yeah, for instance --

19   A.    You could use a hotel.  I mean, yeah, sure.

20   Q.    Yeah.  If I was in college and not living in any

21   one place for a significant period of time I may send it

22   to my parent's house, right, or a friend's house?

23   A.    Oh, certainly.  It could certainly be explained on

24   the return address, for sure.

25   Q.    And on the next page, Page 2, Paragraph 4 down near

*EXAMINATION OF ROBERT WEEKS*

1    the bottom it says that you conducted an administrative

2    search on 1001 Creston Avenue shipping history and

3    discovered 25 postal parcels, correct?

4    *A.*    Yes.

5    *Q.*    And was the one with clothing in it, would that

6    have been listed amongst the 25?

7    *A.*    It would have been.

8    *Q.*    And there were only three that you know what they

9    contained, correct?

10   *A.*    That's correct.

11   *Q.*    And we don't know what the other 22 contained?

12   *A.*    No.

13   *Q.*    And you indicated that using the name, Willie

14   Fontaine, was suspicious.  Is that because you knew

15   Willie Fant lived at that address?

16   *A.*    Yes.

17   *Q.*    You don't know anything about Kevin Whitehead and

18   whether or not he called Mr. Fant, Willie Fontaine?

19   *A.*    I don't.

20   *Q.*    And Bono did this search as well, correct?

21   *A.*    Yes.

22   *Q.*    You mentioned on here that Bono was last certified

23   in January of 2021, on Page 4, Paragraph 6.

24          How did you know that?

25   *A.*    It's a common question I ask dog handlers .

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1    Q.    And do you know what the verification process

2    consists of?

3    A.    No.

4    Q.    You had indicated that it may be -- the parcel may

5    contain proceeds from the sale of controlled substances.

6         Is there a law against mailing cash in the

7    mail?

8    A.    No.

9    Q.    I mean, I know it's not wise.

10   A.    There's no wrong.

11   Q.    If I can get that back from you (indicating

12   document).  This is the affidavit for --

13        **MR. LEFFLER:**  If I could get the affidavit for

14   the anticipatory search.

15        **THE CASE MANAGER:**  Exhibit 4.

16        **MR. LEFFLER:**  Four.

17   *BY MR. LEFFLER*

18   Q.    I've handed you the affidavit in support of the

19   application under Rule 41.

20   A.    This is for the address, correct, residence, yes.

21   Q.    Right.

22   A.    Yes.

23   Q.    And the -- it indicates that on Page 3, Paragraph 7

24   deals with what occurred on April 14th.  And Paragraph 8

25   deals with what occurred on May 11th.  But there's

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1   nothing in there about May 3rd, correct?

2   *A.*   The May 3rd was the parcel of the clothing in it,

3   correct.  No, there's no mention of that.

4   *Q.*   And if I could direct your attention to Paragraph

5   14 on Page 8.  Have you found that?

6   *A.*   Yes.

7   *Q.*   And that indicates your affiant.  That would be

8   you?

9   *A.*   Uh-huh.

10  *Q.*   Intends to reseal the above-mentioned parcel.  I

11  guess that means take out the illegal drugs and put it

12  back.  So you're not actually delivering illegal

13  narcotics, correct?

14  *A.*   That's right.

15  *Q.*   And put an imitation narcotic inside the parcel.

16  *A.*   Uh-huh.

17  *Q.*   In an attempt to make a controlled delivery to

18  William J. Fontaine at the premises, more fully described

19  in Attachment A.

20      Once again, William Fontaine, you believe

21  that to be Willie Fant, correct?

22  *A.*   Yes.  Well, let me just -- perhaps, Willie Fontaine

23  could have been there when we were going to deliver it to

24  the addressee.

25  *Q.*   Okay.  But it doesn't change the fact that you --

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1    you were of the strong suspicion that William Fontaine

2    was, in fact, Willie Fant?

3    *A.*    Correct.

4    *Q.*    And you said when this package was delivered, you

5    were on the telephone; is that correct?

6    *A.*    I was on the phone in communication with our

7    undercover postal inspector who conducted the delivery,

8    for safety concerns.

9    *Q.*    Where physically were you?

10   *A.*    I believe I was around the corner.  I can't

11   remember the name of the street.  But it was adjacent to

12   Creston.  It was an intersection with Creston around the

13   corner.  I believe it was listed to the South.

14              **MR. LEFFLER:**  May I have a moment, Your Honor?

15              **THE COURT:**  You may.

16   *BY MR. LEFFLER*

17   *Q.*    Mr. Weeks, do you know -- I know that -- with what

18   I was referring to was a mail cover that there were some

19   time limits on it.  Are there any time limits on mail

20   watch?

21   *A.*    They only -- can run for six months.

22   *Q.*    Six months?

23   *A.*    They can only run for six months.

24   *Q.*    And at the end of six months can you get it

25   renewed?

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1    *A.*    Correct.

2    *Q.*    All right.  During the six-month period of time do

3    you have to get it renewed again?

4    *A.*    Like before it expires?

5    *Q.*    Well, I mean, with the mail covers, they're good

6    for 30 days.  I mean, you have to renew them.  You have

7    to do that with the mail watch?

8    *A.*    Yes, at the six-month mark if they -- you don't get

9    a notification if they've stopped working, but you can

10   re-up after six months.  But it will not run further than

11   six months.

12          **MR. LEFFLER:**  Your Honor, that's all the

13   questions I have.

14          **THE COURT:**  Any further questions?

15          **MR. ALLEN:**  Just briefly.

16

17                   **REDIRECT EXAMINATION**

18   QUESTIONS BY MR. ALLEN:

19   *Q.*    Special Agent Weeks or Inspector Weeks, what's the

20   process of obtaining the mail watch, is that like an

21   application or ...

22   *A.*    It's to my discretion.  It's an automatic input by

23   myself.

24   *Q.*    And is a mail watch more or less formal than a mail

25   cover?

*EXAMINATION OF ROBERT WEEKS*

1    *A.*    Far less.

2    *Q.*    Far less formal than the mail cover?

3    *A.*    Mail cover is how we restrict information.

4    *Q.*    And that, you have to go through an actual process

5    within the post office?

6    *A.*    It has to be approved by our security center in

7    Chicago.

8    *Q.*    So the six months on the mail watch, is that -- how

9    do you know when that's up, do you get an alert?

10   *A.*    No.

11   *Q.*    Next, let's talk just a little bit about the timing

12   of when these search warrants were obtained.  This was

13   May of 2021 and August of 2021.  That would have been

14   during the COVID-19 pandemic, correct?

15   *A.*    Right.

16   *Q.*    Prior to COVID what was the process for obtaining a

17   search warrant, was it in person?

18   *A.*    Usually.

19   *Q.*    So you could still obtain a search warrant through

20   telephonic means, but that was not the norm, right?

21   *A.*    That's correct.

22   *Q.*    Now, when the pandemic came about did that kind of

23   flip and the norm for obtaining search warrants was

24   through telephonic means, correct?

25   *A.*    Right.

*EXAMINATION OF ROBERT WEEKS*

1    Q.    And just walk me through the process of once a

2    search warrant is signed, how does it go about getting to

3    the Court, like, signed by you, the affiant, for

4    presentation to the Court for review for probable cause

5    purposes?

6    A.    E-mail.

7    Q.    So, that e-mail -- on that e-mail it's -- let's

8    say -- I may even say, I'm on that, as well as the Court

9    and the agent, right?

10   A.    Yes.

11   Q.    And then after that, a time to call to discuss the

12   search warrant is set up, right?

13   A.    Yes.

14   Q.    And then that call is generally, discussions about

15   the search warrant or the facts of the case and the

16   investigation, or is it, I'll swear you in if I find

17   probable cause, and told the warrant would be sent back

18   to you?

19   A.    The judge will review your probable cause.  If he

20   has questions for you at the time, or may not agree with

21   your probable cause at the time, he'll let you know.  But

22   if he has no questions, he or she has no questions,

23   they'll swear you in for that warrant with usually about

24   five questions:  Is this your name on the front page; is

25   this your signature on the application; do you solemnly

*EXAMINATION OF ROBERT WEEKS*

1   swear that the information you're giving to this Court is

2   true, along those lines, yeah.

3   Q.    And do you recall for these warrants, was there any

4   additional questions regarding the probable cause or was

5   it the latter with you being sworn in and answering those

6   questions?

7   A.    There was no additional questions that I can

8   remember.

9   Q.    And then lastly, let's just go over the search

10  warrant return process.  You were asked questions about

11  that.

12       The rules dictate, at least on some warrants

13  when you're required to return those, but what's

14  your specific -- what do you normally do with

15  search warrant returns?

16  A.    It usually got delayed.  I tried not to go past a

17  week, but something's happened that -- usually these come

18  back almost instantly.  I can scan through my phone and

19  send it straight back to the Court.

20  Q.    So you're --

21  A.    It's not a difficult process at all.

22  Q.    And you normally return those, you said, within a

23  week?

24  A.    If I get to a week it's usually some pressing

25  circumstance that has happened, but I never let it get

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1   past that.

2   *Q.*   I believe we saw the two of these, the May 3rd,

3   May 11th were returned on the same day.

4   *A.*   That's -- yeah --

5   *Q.*   Is that what you --

6   *A.*   That's usually my practice, yeah.

7   *Q.*   And then how do you actually get the returns back

8   to the Court?

9   *A.*   By scanning them.

10          **MR. ALLEN:**  That was all the questions I had.

11          **THE COURT:**  Further questions?

12          **MR. LEFFLER:**  Yes, Your Honor, if I may?

13

14                  **RECROSS-EXAMINATION**

15   QUESTIONS BY MR. LEFFLER:

16   *Q.*   The mail watch on Bradford, was that simultaneous

17   with the mail watch on Creston?

18   *A.*   Yes.

19   *Q.*   For the entire time?

20   *A.*   For the entire time, yes, sir.

21   *Q.*   All right.  Bradford didn't end before Creston,

22   correct?

23   *A.*   Not to my memory.  It shouldn't have.

24          Sir?  Oh, yes, sir.  Exhibit.

25          **THE COURT:**  You need those exhibits?

UNREDACTED TRANSCRIPT

*EXAMINATION OF ROBERT WEEKS*

1              You may step down.

2              **THE WITNESS:**  Thank you, sir.

3              (Witness excused.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*EXAMINATION OF ANDREW MALISKAS*

1          **THE COURT:**  How many more witnesses does the

2    Government have?

3          **MR. ALLEN:**  At least one.  And that's going

4    to be the K-9 Handler, Maliskas.  And then if I can

5    consult with Mr. Leffler.  I'm not sure.  It could be two

6    or one.

7          (Conferring with counsel.)

8          Your Honor, I have one that I think that

9    will be shorter and one that might be a little bit

10   longer.  I don't know what Your Honor's intention

11   for this afternoon is.  Maybe if we could squeeze

12   the shorter witness in and take a break for the

13   afternoon or --

14         **THE COURT:**  I don't think -- that probably

15   would make sense.

16         **MR. ALLEN:**  Yes, sir.  We'll call

17   Andy Maliskas.

18         **THE COURT:**  Please come forward and stand

19   in front of the podium.  Raise your right hand to be

20   sworn in to testify.

21                         * * *

22                  **ANDREW MALISKAS,**

23   was called as a witness, and after having been duly sworn,

24   testified as follows:

25

UNREDACTED TRANSCRIPT

*EXAMINATION OF ANDREW MALISKAS*                                           111

1              **THE COURT:**  You may proceed.

2              **MR. ALLEN:**  Thank you, Your Honor.

3

4                           **DIRECT EXAMINATION**

5      QUESTIONS BY MR. ALLEN:

6      *Q.*     If you will state and spell your name for the

7      record.

8      *A.*     Andrew Maliskas, A-N-D-R-E-W, M-A-L-I-S-K-A-S.

9      *Q.*     And where are you employed, sir?

10     *A.*     Bartlett Police Department.

11     *Q.*     Did you have occasion to also work at the DEA here

12     in Memphis?

13     *A.*     Yes, sir, I was assigned to the DEA task force from

14     September 2020 until July of this of year.

15     *Q.*     Okay.  How long have you -- you said, "Bartlett"?

16     *A.*     Yes, sir.

17     *Q.*     How long were you with Bartlett first?

18     *A.*     Eleven years.

19     *Q.*     And during that time you maintained the role of a

20     law enforcement officer?

21     *A.*     Yes.

22     *Q.*     And then you were a task force officer of DEA.  It

23     sounds like you just went back.

24     *A.*     I did.

25     *Q.*     You also are a trained K-9 handler?

UNREDACTED TRANSCRIPT

1   A.   Yes, sir.

2   Q.   What's your dog's name?

3   A.   Bono.

4   Q.   And Bono is a K-9 officer that goes through

5   training as well?

6   A.   Yes, sir.

7   Q.   Tell us a little bit about the training that you

8   first have to have to become a certified K-9 handler.

9   A.   Okay.  When we go, we pick out a dog and we test

10  their ability, basically make sure that they have all the

11  right behaviors to be able to want to do the job and are

12  able to do the job.  We do that at a -- we got Bono at a

13  facility outside of Knoxville with their trainers and our

14  trainer on hand so that we got the best pick.  Made sure

15  that he was -- had all the aptitude.  Picked him out and

16  brought him back and we did about 10 weeks of training

17  with him for Simpler, which, he's a narcotics detection

18  dog, so he's trained to smell marijuana, meth, MDMA,

19  cocaine, crack and heroin.  And then on top of that we

20  also did bite work training and that took 10 weeks.

21  Q.   So it was 10 Weeks total at the outset?

22  A.   Yes, sir.

23  Q.   When did you first get Bono?

24  A.   September of 2014.

25  Q.   And you've been working with Bono since?

1   A.    Yes, sir.

2   Q.    Has there been any gaps in time where you weren't a

3   K-9 officer or if you were a K-9 officer, you had someone

4   different than Bono?

5   A.    No, I've always had Bono.

6   Q.    What kind of dog is Bono?

7   A.    He's a Belgian Malinois.

8           **THE COURT:**  I'm sorry, a what?

9           **THE WITNESS:**  A Belgian Malinois.

10          **THE COURT:**  All right.

11  *BY MR. ALLEN*

12  Q.    The training, you said there was -- you mentioned

13  several narcotics that Bono's trained to alert to.  Tell

14  us a little bit more of that.  Did they actually alert to

15  narcotics, the presence of narcotics?  Talk me through a

16  little bit of that.

17  A.    Okay.  So, the dogs don't alert to narcotics

18  themselves, they alert to the presence of the odor.  So

19  there are -- of those odors, there are varying times that

20  some of them can hang around.  I read in a magazine one

21  time that --

22          **MR. LEFFLER:**  Objection.  Hearsay, Your Honor.

23          **THE COURT:**  Response?

24          **MR. ALLEN:**  I mean, it's his personal

25  knowledge of what he read.  He's asserting what he read.

UNREDACTED TRANSCRIPT

1    I think it's more so going for his state of mind and his

2    training.  But we can move forward.

3                    **THE COURT:**  Why don't you move forward.

4                    **MR. ALLEN:**  Yes, sir.

5    *BY MR. ALLEN*

6    *Q.*    Okay.  So the training you start at 10 weeks with

7    Bono in 2014, do you go through yearly training?

8    *A.*    We go through training bimonthly, twice a month.

9    We train for eight hours on narcotics detection.

10   *Q.*    And has that been going on since 2014?

11   *A.*    Yes, sir.

12   *Q.*    Do you -- who is the association that certifies

13   Bono?

14   *A.*    NNDDA, the National Narcotic Detector Dog

15   Association.

16   *Q.*    And did I ask you to provide some records regarding

17   Bono's certification?

18   *A.*    Yes, sir.

19   *Q.*    I'll pass these forward and see if you recognize

20   them.

21   *A.*    (Reviews document.)

22           Yes, sir, these are his records.

23   *Q.*    And those are his records from 2018 to 2022?

24   *A.*    Yes, sir.

25   *Q.*    And what do you have to do with Bono to receive

1   this certificate?

2   A.    We have to be tested every year.  And that -- the

3   specifics of it, I'm not sure.  We don't do that

4   in-house.  We go through the NNDDA and there's a

5   certifying official on-site to make sure we can do that.

6   But we have to make sure that our drugs can alert to

7   the -- or that our dogs can alert to the odor of the

8   drugs and not have false alerts or missed finds.

9   Q.    And you brought records, like I said, from 2018 to

10  2022.  Are those fair and accurate records to the best of

11  your knowledge?

12  A.    Yes, sir.

13          **MR. ALLEN:**  Your Honor, I'd ask that that be

14  the next numbered exhibit.  I believe we're at five.

15          **THE COURT:**  Any objection?

16          **MR. LEFFLER:**  No objection.

17          **THE COURT:**  Admitted.

18          (WHEREUPON, a document was marked as Exhibit

19          Number 5.)

20          **THE CASE MANAGER:**  Your Honor, the last one

21  was to be admitted at a later time.  Should I make this

22  one 5 or --

23          **THE COURT:**  Which one?

24          **THE CASE MANAGER:**  I think it was the one they

25  were going to admit at a later date, a statute or submit

*EXAMINATION OF ANDREW MALISKAS*

1    the statute.

2             **THE COURT:**  Right.  Yeah, that's 5.

3             **THE CASE MANAGER:**  This one from -- okay.

4    Yes, sir.

5             **THE COURT:**  Exhibit 5.

6             **MR. ALLEN:**  Thank you, Your Honor.  Just

7    publishing.

8             (WHEREUPON, a document was marked as Exhibit

9             Number 5.)

10   *BY MR. ALLEN*

11   *Q.*    So, for example, on one of these certificates we

12   have your name, and then the K-9's name attached to it.

13   It has, "Satisfactorily completed the certification

14   standards of the NNDDA, The National Narcotic Detector

15   Dog Association," correct?

16   *A.*    Yes, sir.

17   *Q.*    Okay.  So, Bono was certified in 2021 and 2022 as

18   well?

19   *A.*    Correct.

20   *Q.*    Next, I want to direct your attention to May of

21   2021.

22   *A.*    Yes, sir.

23   *Q.*    Do you recall being in contact with postal

24   inspector Bobby Weeks?

25   *A.*    Yes, sir.

*EXAMINATION OF ANDREW MALISKAS*

1   Q.   How often would you be in contact with Inspector

2   Weeks?

3   A.   Almost daily.

4   Q.   And what was the purpose of that?

5   A.   Well, he sat at a desk next to mine at the office.

6   But typically he would call me if he needed a drug

7   detector dog to be running a package for him.

8   Q.   So, on May 3rd of 2021, there was a parcel that

9   Bono was utilized to alert on.  Do you recall that event?

10  A.   No, sir, I'd have to look at the records.

11  Q.   Okay.

12  A.   I know that he utilized me almost weekly, though.

13  Q.   So you wouldn't have independent recollection of

14  the search or the events surrounding that parcel?

15  A.   No.

16  Q.   Let me ask you this.  How would Bono alert?

17  A.   He's what's called a "passive alert dog."  So, he

18  basically freezes.  It's contrary to his nature to be

19  still, so we get a good sit or a lay and that let's me

20  know that he's alerted to the presence of the odor.

21  Q.   But you don't recall this May 3rd 2021 parcel on

22  alert?

23  A.   Not specifically.

24  Q.   What about a search of a parcel where clothing was

25  recovered?

UNREDACTED TRANSCRIPT

*EXAMINATION OF ANDREW MALISKAS*

1    A.    I do recall that, yes.

2    Q.    In the investigation of Willie Fant?

3    A.    Yes.

4    Q.    Tell us just what you remember about that, just

5    where the -- do you recall where the search was done?

6    A.    I don't remember where we sniffed the package, but

7    I know the search was done at the Memphis office for the

8    DEA.

9    Q.    Okay.

10   A.    So once we got a warrant signed and were able to

11   open it we did the search there.

12   Q.    Was that generally what would happen; the search

13   would be done at the Memphis DEA office?

14   A.    Yes, sir.

15   Q.    And walk me through the process of how you set the

16   parcel up to give Bono a chance to alert or not.

17   A.    Okay.  So, we would set that up in an array of

18   other boxes that contained office materials, packaging,

19   things like that that would come -- that would

20   customarily be inside of post office boxes.  We would set

21   that out in various places in our office, at the post

22   office, depending on where we were.  Sometimes it would

23   be at the airport.  And we'd make sure that we'd do that

24   so that the dog doesn't know.  And it's a blind test for

25   me too, so that we're making sure that we're not giving

*EXAMINATION OF ANDREW MALISKAS*

1   any indication to myself or the dog, that -- which

2   package is the suspect package.

3   Q.    And do you recall if you followed that practice for

4   this May 3rd, 2021 parcel?

5   A.    Yes, sir.  I'm sorry.  Can I retract that for a

6   second?  I don't want to retract that, but I want to

7   clarify.

8   Q.    Yes, sir.

9   A.    I don't recall a time that we didn't do that, but I

10   don't recall this specific package either.

11   Q.    And is that --

12   A.    So, we typically -- what we would do is put that

13   out in an array of packages.

14   Q.    Is that because you've done several of these -- so

15   many of --

16   A.    Fifty, probably a year.

17   Q.    Similar question regarding the May 11th parcel.  Do

18   you recall in the Willie Fant investigation that

19   Inspector Weeks called you again to utilize Bono for

20   another search of a package?

21   A.    Yes.

22   Q.    Do you happen to recall the specifics regarding

23   that one?

24   A.    No, sir.

25   Q.    Would you -- do you recall if you engaged in that

*EXAMINATION OF ANDREW MALISKAS*

1    same practice of utilizing multiple parcels or different

2    locations to avoid the -- to kind of throw Bono off?

3    A.    We would have hit it among an array of other

4    packages or office supplies or luggage or -- I don't

5    even -- I don't know the line of your questioning.  I'm

6    sorry.

7            Is that what you're asking --

8            (Simultaneous, unreportable crosstalk.)

9    Q.    That is.

10   A.    Okay.

11   Q.    If you recall.  I mean, I think your answer earlier

12   was that you don't specifically recall it, but there

13   wasn't a time that you didn't engage in the same

14   practice.

15   A.    Right.

16   Q.    So my question is, do you happen to recall on this

17   May 11th, any specifics?

18   A.    No, sir.

19   Q.    Do you recall a scenario in which Inspector Weeks

20   would have put Bono alerted, when Bono, in fact, did not

21   alert?

22   A.    He would not have done that.

23            **MR. ALLEN:**  Okay.  I think that's all the

24   questions I have.  I'll pass the witness.

25            **THE COURT:**  Cross-examination?

UNREDACTED TRANSCRIPT

*EXAMINATION OF ANDREW MALISKAS*

1              **CROSS-EXAMINATION**

2    QUESTIONS BY MR. LEFFLER:

3    *Q.*    Officer Maliskas, did you learn after May 3rd that

4    Bono had alerted on clothing as opposed to controlled

5    substances?

6    *A.*    He doesn't alert on controlled substances.  He

7    alerts on the odor of them.

8    *Q.*    All right.  I'll ask it again.

9          Did you learn after May 3rd that Bono had

10   alerted on the odor of clothing?

11   *A.*    No.

12   *Q.*    Is today the first time you've heard that?

13   *A.*    It would be hard for me to testify on what he

14   alerted to.  That wouldn't have been the presence of the

15   odor of narcotics.

16   *Q.*    Well, I take it that you go to the DEA office with

17   Officer Weeks and you set up the boxes or whatever it is

18   you're putting out there.  One of them is the package

19   that Officer Weeks brought that he suspects has

20   controlled substances in it, it may smell of, even,

21   controlled substances to a dog.

22   *A.*    Okay.

23   *Q.*    And then the dog alerts on a package and then

24   Officer Weeks, at that -- at that point what do you do?

25   *A.*    When he alerts on the package?

*EXAMINATION OF ANDREW MALISKAS*

1    Q.    Yes, once he alerts on the package.

2    A.    I praise him, tell him he's a good dog, give him a

3    ball reward, and then I put him away.

4    Q.    And so, you don't -- you are not present when the

5    package is open.

6    A.    Sometimes I am and sometimes I'm not.

7    Q.    Do you remember being present when this particular

8    package was opened that the dog alerted to on May 3rd?

9    A.    I don't recall.

10   Q.    Would you be surprised that the dog alerted on

11   clothing?

12   A.    Yes.

13   Q.    Why is that?

14   A.    Because he alerts to the odor of narcotics.

15   Q.    Is there any explanation why he would have alerted

16   on the clothing?

17   A.    The odor can linger.

18   Q.    So, traces of narcotics, he could alert on that; is

19   that correct?

20   A.    He would alert on the odor in traces, of course.

21   Q.    We don't know whether there were traces of

22   narcotics on the clothing that he alerted on or not,

23   because they were never tested.

24         I guess I'm asking if you're an expert with

25   this dog.  You know this dog backwards and

UNREDACTED TRANSCRIPT

*EXAMINATION OF ANDREW MALISKAS*

123

1    forwards?

2    A.    Yes, sir.

3    Q.    Has the dog ever alerted on anything else that was

4    not narcotics?

5    A.    No, sir.

6    Q.    Is this the first time it's ever happened?

7    A.    Yes, sir.

8    Q.    And then do you realize that a week later you --

9    Bono alerted on another package?

10   A.    Okay.

11   Q.    Do you realize that?

12          Do you know that?

13   A.    It happened almost weekly.  I'm sure he did.

14   Q.    The dog -- it sounds like the dog needs to be

15   recertified annually; is that correct?

16   A.    Yes, sir.

17   Q.    Why is that?

18   A.    Just to make sure that they're performing properly

19   and doing what's expected of them.

20   Q.    You would know whether the dog was performing

21   properly, wouldn't you?

22   A.    Yes.

23   Q.    What does the recertification process consist of?

24   A.    Numerous hides that the independent certifying

25   official puts out.  It allows us to run through and make

UNREDACTED TRANSCRIPT

*EXAMINATION OF ANDREW MALISKAS*

1   sure the dog's alerting on normal things that he's

2   supposed to alert on and not missing things that he's

3   supposed to alert on.

4   Q.   Does it concern you that he alerted on clothing?

5   A.   No, because like I said, he alerts to the presence

6   of the odor of narcotics, which can linger.

7   Q.   But you don't know whether there was an odor of

8   narcotics on that clothing, do you?

9   A.   My dog gave me a good indication of that.  That

10  says that there's a fair probability that there was an

11  odor of narcotics on those clothes.

12  Q.   But you don't know that.

13  A.   No.

14  Q.   And you don't remember this particular package --

15  A.   No, sir.

16  Q.   And watching Bono alert on it right, correct?

17  A.   No, sir.

18  Q.   Had you been told that Bono alerted on clothing,

19  would you have wanted to have that clothing tested for

20  residue?

21  A.   No, sir.

22  Q.   Why not?

23  A.   There would be no point in it.  There would be

24  no -- it would be a waste of government resources,

25  frankly.

*EXAMINATION OF ANDREW MALISKAS*

1   *Q.*   And why is that?

2   *A.*   Why would we test something that's -- if there's an

3   odor there that -- if we didn't find what we were looking

4   for?

5   *Q.*   Well, you wouldn't know if there was an odor there

6   or not, correct?

7   *A.*   I would, because my dog alerted to it.

8   *Q.*   Your dog would?

9   *A.*   Right.

10          **MR. LEFFLER:**  That's all the questions I have.

11          **THE COURT:**  Anything further?

12          **MR. ALLEN:**  No, Your Honor.

13          **THE COURT:**  You may step down.

14          (Witness excused.)

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

*EXAMINATION OF JOSEPH PALAZZOLO*

1      **THE COURT:**  It's approaching 12:30, so we have

2   at least, what, one more.  Is there one more?

3      **MR. ALLEN:**  Yeah, it's -- Special Agent

4   Palazzolo is going to be the last witness.

5      **THE COURT:**  So we'll take an afternoon -- or

6   the noon lunch break.

7      **THE CASE MANAGER:**  Judge, we have a 1:30 about

8   Mr. Ballin's contested hearing.  We have one which will

9   require an interpreter -- a 2:30 probable cause hearing,

10  so ...

11      (An off-the-record discussion was held.)

12      **THE COURT:**  I was just checking with my case

13  manager, going over the afternoon calendar and I have a

14  1:30 mental hearing.  So, why don't we -- we can meet at

15  1:45.  And I have some matters in the afternoon that

16  we'll try to reschedule so that we can complete the

17  suppression hearing.

18      **MR. ALLEN:**  I think that 1:30 is good with me,

19  Your Honor.

20      **THE COURT:**  Oh, okay.

21      **MR. ALLEN:**  And I made contact with defense

22  counsel on that.  So I'll try to provide the Court an

23  update.

24      **MR. LEFFLER:**  1:45 would be better for me,

25  Your Honor, if we could do that.

1          **THE COURT:**  We'll schedule for 1:45.

2          **MR. ALLEN:**  Yes, sir.

3          **THE COURT:**  The Court will stand in recess

4   until 1:45 or 1:30 for our hearing.

5          **MR. LEFFLER:**  Yes, sir.

6          **CASE MANAGER:**  All rise.  This Court's now in

7   recess.

8              (Lunch break.)

9          **THE COURT:**  Good afternoon.  We are continuing

10  in the suppression hearing in the case of *United States*

11  *vs. Willie Fant*, 21-cr-20179.

12              All the parties are present.  Mr. Allen,

13  you can call your next witness.

14          **MR. ALLEN:**  Thank you.  This is the final

15  witness for the Government.  It's Special Agent Joseph

16  Palazzolo.

17          **THE COURT:**  Please come forward and stand in

18  front of the podium.  Raise your right hand to be sworn

19  in to testify.

20                          * * *

21              **JOSEPH PALAZZOLO,**

22  was called as a witness, and after having been duly sworn,

23  testified as follows:

24          **THE COURT:**  You may proceed.

25          **MR. ALLEN:**  Thank you, Your Honor.

UNREDACTED TRANSCRIPT

1                          **DIRECT EXAMINATION**

2    QUESTIONS BY MR. ALLEN:

3    Q.    Can you please state and spell your name for the

4    record, sir.

5    A.    Joseph Palazzolo, J-O-S-E-P-H, P-A-L-A-Z-Z-O-L-O.

6    Q.    And where are you employed, sir?

7    A.    Drug Enforcement Administration.

8    Q.    How long have you been employed at the DEA?

9    A.    About two and a half years.

10   Q.    How long have you been here in the Memphis office?

11   A.    Almost two years.

12   Q.    Through the course of your employment at DEA as a

13   Special Agent did you have occasion to participate in the

14   investigation of Willie Fant?

15   A.    I did.

16   Q.    What was your role in that investigation?

17   A.    I was the primary case agent.

18   Q.    And what does that mean?

19   A.    It means I do most of the work in finding

20   intelligence or doing surveillance with the help of

21   others, but on the primary, I'm probably going to know

22   most of the information about the case.

23   Q.    So you're the lead investigator --

24   A.    Yes.

25   Q.    Is that fair to say?

*EXAMINATION OF JOSEPH PALAZZOLO*

1    *A.*    Yes.

2    *Q.*    And then how did this investigation began into

3    Mr. Fant?

4    *A.*    The DEA has a section headquarters that monitors

5    pill presses being purchased and sent and they had sent a

6    tip that a suspicious purchase of a pill press was being

7    sent to the Memphis area of operations.

8    *Q.*    And you investigated that?

9    *A.*    Yes.

10   *Q.*    And what did you find out?

11        Who -- where was that being sent to?

12   *A.*    The form with the information on it, which is a DEA

13   452, was being sent to 1001 Creston to a clothing

14   company, Dirty Life Clothing, and had a phone number also

15   on the shipping label.

16   *Q.*    Based on your training and experience is

17   there -- have you ever encountered a clothing company

18   utilizing a pill press?

19   *A.*    I have not.

20   *Q.*    After you get this notification you began an

21   investigation into, is it the address first or -- at what

22   point do you learn of Mr. Fant?

23   *A.*    So, the address that the pill press was going to

24   was associated with Mr. Fant and also, the phone number

25   of the recipient on the -- of the pill press.  That phone

UNREDACTED TRANSCRIPT

EXAMINATION OF JOSEPH PALAZZOLO

1    also belonged to Mr. Fant.

2    Q.    After you investigated the address of the pill

3    press, what were you able to determine in regards to

4    Mr. Fant in terms of drug trafficking?

5    A.    I started the investigation using administrative

6    subpoenas of phone companies.  I was able to determine

7    that he was in contact with multiple known drug

8    traffickers throughout the country.

9    Q.    Is that from other cases or how are they known?

10   A.    Yes, from other DEA cases.

11   Q.    So you had the information regarding the pill press

12   that comes to a clothing company and then you investigate

13   the address and you learn Mr. Fant's name and then you

14   investigate him and that's when you see that he's in

15   contact with other drug traffickers, right?

16   A.    Yes.

17   Q.    Then at what point do you bring in postal to start

18   checking for packages at that address?

19   A.    It was at the beginning of the investigation.

20   It's -- I mean, checking with postal's almost, for lack

21   of a better term, on a checklist, per se.  You know, it's

22   something that's a good investigative tool to use at the

23   beginning of any investigation.

24   Q.    And you've been the case agent at the table today

25   so you're aware of the three search warrants that was

*EXAMINATION OF JOSEPH PALAZZOLO*

1   done on parcels addressed to 1001 Creston?

2   A.    Yes.

3   Q.    But you weren't the affiant of any of those?

4   A.    I was not.

5   Q.    But were you present for the second one when the

6   marijuana was recovered?

7   A.    Yes.

8   Q.    Were you present for the execution of the third one

9   where the methamphetamine was recovered?

10  A.    Yes.

11  Q.    Flash forward to August 18, 2021, the day of the

12  controlled delivery and then the subsequent search of

13  1001 Creston.  Were you present for that as well?

14  A.    Yes.

15  Q.    Leading up to it, did you have a briefing with

16  other law enforcement officers regarding that day?

17  A.    Yes.

18  Q.    Did you share with them the information that you've

19  just testified to regarding the pill press and the

20  packages and make that known to others?

21  A.    Yes.

22  Q.    Tell us what you did on that day?

23  A.    On the day of the search warrant?

24  Q.    Starting with after the package goes into the

25  residence and then the FBI comes.

UNREDACTED TRANSCRIPT

*EXAMINATION OF JOSEPH PALAZZOLO*

1  *A.*   So, after the package goes in and the FBI swat team

2  executes the search warrant on the house, once they

3  cleared the house and made the house safe, I, along with

4  several other TFOs and agents conducted the evidence

5  search of the residence.

6  *Q.*   Do you recall what, if anything, you found that

7  day?

8  *A.*   Yes.  So the package that was delivered during the

9  controlled delivery was on -- was placed on a bed in one

10  of the bedrooms.  That bedroom also had Mr. Fant's

11  driver's license in it, along with lease paperwork and

12  several other documents with Mr. Fant's name on it.

13       On a desk, there was a digital scale with

14  residue on it.  And then I also found a small, hard

15  case, like a pelican case with magnets attached to

16  it.  Inside of that case was crystal

17  methamphetamine.  And then on a night stand next to

18  the bed there were two loaded pistols.

19  *Q.*   Did you find the pill press at 1001 Creston?

20  *A.*    Yes.  In another room, the pill press was in a

21  suitcase with many different colored powders next to it.

22  And in that same room in the closet was another firearm

23  and some more prescription pills that were not in the

24  original containers.

25  *Q.*   Prior to going to Creston that day and

*EXAMINATION OF JOSEPH PALAZZOLO*

1  participating in the execution of the search warrant what

2  was your attention with regards to taking Mr. Fant into

3  custody?

4  A.   We had -- I had planned to take him into custody

5  and I was able to acquire a criminal complaint the next

6  day.

7  Q.   Okay.  Now, let me clarify this.  The searching of

8  the residence, the finding of the pill press and the

9  firearms, did you encounter Mr. Fant that day and talk to

10  him?

11  A.   I talked to him at our office, but I did not have

12  any contact with him prior to that.

13  Q.   On the scene?

14  A.   Correct.

15  Q.   Would that have been after you finished searching

16  the residence --

17  A.   Yes.

18  Q.   That you spoke to Mr. Fant at your office?

19  A.   Yes.

20  Q.   Did you come into possession of a phone?

21  A.   I did.

22  Q.   All right.  Talk me through how you came into

23  possession of it.  Was it an iPhone?

24  A.   Yes, it was an iPhone.  It was presented to me

25  as -- after Mr. Fant was taken into custody it was given

*EXAMINATION OF JOSEPH PALAZZOLO*

1  to me as, like, this is his phone.  So I secured it in a

2  locker for -- to await a search warrant.

3  *Q.*    And did you seek a federal search warrant for that

4  cellular telephone?

5  *A.*    I did.

6  *Q.*    Do you recall what if anything of substance, or

7  stood out regarding the cellphone that occurred while you

8  were waiting to obtain the search warrant for the

9  cellphone?

10  *A.*    Yes.  So while the phone was in a temporary storage

11  locker the alarm or ring tone or, you know, we didn't

12  know at the time, started going off.  Obviously, in order

13  to not have that go off repeatedly, opened the locker and

14  grabbed the phone so I could silence the alarm and it

15  said "LFA machines" or something of that nature, "LFA

16  machine press" or something of that nature on the --

17  like, that was what the alarm was for.

18          **MR. ALLEN:**  I'll pass forward -- permission to

19  approach?

20          **THE COURT:**  You may.

21  *BY MR. ALLEN*

22  *Q.*    If you'll take a look at that and see if you

23  recognize what that is.

24  *A.*    (Reviews document.)

25          This is my application and affidavit and

1    return.

2    Q.    For?

3    A.    For a search warrant of the telephone.

4            **MR. ALLEN:**  I ask that that be the next

5    numbered exhibit.

6            **THE COURT:**  Any objection?

7            **MR. LEFFLER:**  No, Your Honor.

8            **THE COURT:**  Admitted.

9            **THE CASE MANAGER:**  Exhibit 6.

10           (WHEREUPON, a document was marked as Exhibit

11           Number 6.)

12           **MR. ALLEN:**  For the record, I'm publishing

13   Exhibit 6.  This is going to be Page 7 of the search

14   warrant packet.

15   *BY MR. ALLEN*

16   Q.    Was this the alert that was going off on the phone

17   that you mentioned?

18   A.    Yes.

19   Q.    And this was the phone that was recovered from

20   Mr. Fant, Willie Fant?

21   A.    Yes.

22   Q.    On August 16, 2021?

23   A.    Eighteen.

24   Q.    On August 18?

25   A.    Yes.

*EXAMINATION OF JOSEPH PALAZZOLO*

1    Q.    Now, did you have to manipulate the phone in any

2    way, shape, form, or fashion to see it?

3    A.    I did not.

4    Q.    And after you obtained the search warrant for the

5    telephone were you able to search it?

6    A.    Well, I brought it to the secret service and they

7    utilized their programs to extract any information.  And

8    it was only a partial extraction of the phone.

9    Q.    And then that's reflected on what was

10   returned -- it's on the return here, right?

11   A.    Yes.

12   Q.    So Mr. Fant was taken into custody on the 18th.

13   And where was he taken that evening?

14   A.    To the Bartlett Police Department.

15   Q.    And why was that?

16   A.    Because it was too late in the day to get him down

17   to the US Marshals and I needed to get the criminal

18   complaint, which I wasn't able to obtain until the next

19   day, so we had to house him overnight in a facility.

20   Q.    And why wasn't he released?

21   A.    Because he was under arrest for methamphetamine.

22   Q.    You had fully planned on charging him through the

23   criminal complaint, correct?

24   A.    Yes.

25   Q.    And you obtained the criminal complaint the next

*EXAMINATION OF JOSEPH PALAZZOLO*

1    day?

2    A.    I did.

3    Q.    And was Mr. Fant transported then from Bartlett

4    down to the Federal Court here?

5    A.    Yes.

6    Q.    Going back to the initial date of the search

7    warrant, and you said you had planned to speak to

8    Mr. Fant at the DEA office, correct?

9          You had attempted to interview him?

10   A.    Yes.

11   Q.    Were you able to interview Mr. Fant?

12   A.    No.

13   Q.    Did you attempt to advise him of his rights and see

14   if he was willing to waive those rights and speak to you?

15   A.    Yes.

16   Q.    And did he make any statements?

17   A.    Nothing, no, other than that.  He didn't want to

18   talk.

19   Q.    Then the next day once you went and picked him up

20   to transport him down here, did this -- did you attempt

21   to ask Mr. Fant any questions or interview him during

22   that process of bringing him down to Federal Court?

23   A.    No.

24   Q.    Did Mr. Fant make any voluntary statements to you

25   from that drive from Bartlett down to Federal Court

UNREDACTED TRANSCRIPT

*EXAMINATION OF JOSEPH PALAZZOLO*

1    regarding drug trafficking of this case?

2    A.    To my knowledge, yes.

3    Q.    Okay.  What do you recall that he said?

4    A.    I'll have to refer to my report if that's okay?

5    Q.    Sure.

6    A.    (Reviews document.)

7    Q.    Have you had a chance to review that report?

8    A.    Yes.

9    Q.    Did that refresh your recollection on any statement

10   that Mr. Fant would have made transporting him from

11   Bartlett to Federal Court the next day, which was

12   August 19th, 2021?

13   A.    Yes.

14   Q.    If I could have that back.

15   A.    Okay.

16   Q.    What do you recall he said?

17   A.    I didn't transport him.  It was Special Agent

18   Lenatti.

19   Q.    So you weren't familiar with any statement?

20   A.    No, just what was told to me by Special Agent

21   Lenatti that I put in the report.

22   Q.    And what was related to you from Special Agent

23   Lenatti?

24   A.    He said that Mr. Fant said he'll be more willing to

25   talk once he knows what he's being charged with and that

UNREDACTED TRANSCRIPT

*EXAMINATION OF JOSEPH PALAZZOLO*

1  he was just a peon in the operation and that he knew who

2  snitched on him because it was somebody who got arrested

3  and didn't get any time.

4  Q.   But it's your understanding that those statements

5  weren't made based on questions from Special Agent

6  Lenatti while Mr. Fant was in custody?

7  A.   Correct.

8         **MR. ALLEN:**  If I may have one moment, Your

9  Honor?

10        **THE COURT:**  Yes.

11        **MR. ALLEN:**  I'll pass the witness, Your Honor.

12        **THE COURT:**  Cross-examination?

13

14               **CROSS-EXAMINATION**

15  QUESTIONS BY MR. LEFFLER:

16  Q.   Mr. Palazzolo, I wanted to ask you, you heard what

17  Officer Weeks said about the pill press.  It does have

18  legal uses.  Would you agree with that?

19  A.   Yes.

20  Q.   Herbalists can use it for making herbal remedies

21  and things of that nature, correct?

22  A.   I don't know all the legitimate uses for a pill

23  press, but I guess that's possible.

24  Q.   Well, I've got something from the Cleveland Clinic

25  here.  It talked about herbal supplements and pill

1    presses.

2                **MR. LEFFLER:**  May I approach, Your Honor?

3                **THE COURT:**  You may.

4    *BY MR. LEFFLER*

5    *Q.*    Something that I read off of the Internet.  Is that

6    a pill press that's being advertised there?

7    *A.*    (Reviews document.)

8          They're advertising it as one.  It doesn't

9    look like any pill press I've ever seen, but

10   somebody --

11   *Q.*    Well, is it just being advertised in connection

12   with making herbal remedies?

13   *A.*    Yes.

14               **MR. LEFFLER:**  I'll mark it for identification

15   purposes.

16               **THE CASE MANAGER:**  Is this for identification

17   only?

18               **MR. LEFFLER:**  Actually, I said

19   "Identification," but I think it has been identified.

20   We'll mark it as an exhibit.

21               **THE COURT:**  Any objection?

22               **MR. ALLEN:**  No, Your Honor.

23               **THE COURT:**  Admitted.

24               (WHEREUPON, a document was marked as Exhibit

25               Number 7.)

*EXAMINATION OF JOSEPH PALAZZOLO*

1   *BY MR. LEFFLER*

2   *Q.*    Did you ultimately determine that the named

3   recipient for that pill press was not Willie Fant?

4   *A.*    Yes.

5   *Q.*    The person who was named recipient was Portia

6   Robertson [sic]; is that correct?

7   *A.*    It was Naportia Robinson.

8   *Q.*    You said, Naportia Robinson?

9   *A.*    On the bill, on the DEA 452, yes.

10  *Q.*    I mispronounced the name.

11  *A.*    You said, "Portia."  It's Naportia.  That's the

12  name on it.

13  *Q.*    Okay.  That's not Willie Fant, right?

14  *A.*    That's correct.

15  *Q.*    And how did you determine that she was the named

16  recipient for the press that went to 1001 Creston?

17  *A.*    It was on the DEA form 452.

18  *Q.*    And you knew that as early as April the 14th of

19  2021; is that correct?

20  *A.*    Yes.

21  *Q.*    So, when you found out that that pill press, that

22  Mr. Fant was not the named recipient of it, why was there

23  any further investigation into Mr. Fant?

24  *A.*    Because he was the identified person at the address

25  of 1001 that held the utilities and also the phone number

*EXAMINATION OF JOSEPH PALAZZOLO*

1    that was listed under Naportia's name on the form was a

2    phone number that belonged to Mr. Fant.  And also, the

3    clothing company was also associated with Mr. Fant.

4    Q.    Dirty Life Clothing company?

5    A.    Yes.

6    Q.    Now, Mr. Fant was followed at some point during the

7    course of the investigation and the law enforcement that

8    was following him lost him in the area of Pendleton Road,

9    Lamar Avenue and Kendall Avenue, where it says that he

10    had a business address at 2780 Kendall.

11          What was that business?

12    A.    Dirty Life Clothing.

13    Q.    So, it was a clothing company?

14    A.    Yes.

15    Q.    And I think you said earlier that you were

16    surprised that a clothing company would be ordering a

17    pill press.  Are you still surprised that knowing that it

18    was directed towards Naportia Robinson -- are you still

19    surprised that they would be ordering a pill press?

20    A.    Yes.

21    Q.    And why is that, why are you still surprised?

22    A.    Because there's no use for a pill press in

23    clothing.  It's not used to make any part of the

24    clothing.  It has no use for a clothing company.

25    Q.    Well, apparently it wasn't for a clothing company.

*EXAMINATION OF JOSEPH PALAZZOLO*

143

1    It was for a Naportia Robinson, correct?

2    A.    No, it was being sent to Dirty Life Clothing at

3    1001 Creston Avenue with her name and Mr. Fant's phone

4    number.  So Dirty Life Clothing was on there.

5    Q.    She was named the recipient, correct?

6    A.    One, yes.

7    Q.    Do you recall preparing an affidavit in support of

8    the complaint?

9    A.    Yes.

10   Q.    And that was in order to charge him, correct?

11   A.    Yes.

12   Q.    And in that affidavit at Paragraph 8 on Page 3, do

13   you recall saying, your affiant believed that Fant was

14   the intended recipient of this particular parcel, not

15   withstanding the false moniker of William Fontaine?

16   A.    I'd have to refer to the affidavit.

17   Q.    Pardon the yellow highlights.

18   A.    That's okay.

19   Q.    I believe it's Paragraph 8.

20   A.    (Reviews document.)

21          Yes, I do remember that.

22   Q.    And that indicates that whenever the name William

23   Fontaine was used, you and other law enforcement

24   considered that to be Willie Fant, correct.

25          That was -- the recipient of William

*EXAMINATION OF JOSEPH PALAZZOLO*

1    Fontaine was, in fact, Willie Fant; is that --

2    A.    That's what we suspected, yes.

3    Q.    All right.  And did you discuss that with

4    Mr. Weeks?

5          Was that his understanding as well, as far

6    as you know?

7    A.    Yes.

8    Q.    And was there a reason why in that affidavit you

9    did not mention anything about the package that was

10   intercepted on May 3rd?

11         Would you like to see the affidavit again?

12   A.    That was the one with the clothing?

13   Q.    Right, right.

14   A.    Is there any reason -- no, I don't have any reason

15   it's -- I didn't list it in there.  It wasn't ...

16   Q.    Well, you said you didn't have any reason to list

17   it.  You knew about it, right?

18   A.    I did know about it, yes.

19   Q.    And is there any reason why you did not indicate in

20   the affidavit of complaint that it was found to have

21   clothing in it and not drugs?

22   A.    Because it's not illegal to have clothes.  I

23   wouldn't file a -- I wouldn't charge somebody with

24   clothes.  Sorry.  I didn't put it in the affidavit for

25   the complaint.

*EXAMINATION OF JOSEPH PALAZZOLO*

1    Q.    Were you relying on the dog to accurately sniff out

2    drugs when Officer Weeks took the dog in for that, I

3    mean, took the package in for that?

4    A.    Yes.

5    Q.    And were you surveilling the property on August 18

6    to see what happened before, during and after the package

7    was delivered?

8    A.    I was in the area before it was delivered and when

9    it was being delivered.  And then after it was delivered

10   I did see the FBI swat team execute the search warrant.

11   But prior to that I did not have any direct line of sight

12   to the residence.

13   Q.    So what was going on the first time you had a

14   direct line of sight to the residence?

15   A.    The FBI swat team was executing the search warrant.

16   Q.    So, you weren't watching when the package was

17   delivered?

18   A.    Correct.

19   Q.    And you weren't watching when the package was

20   retrieved?

21   A.    Correct.

22   Q.    But it was shortly after that that the word was

23   given to execute the warrant, correct?

24   A.    Correct.

25   Q.    In -- when you received the -- well, when a message

1   was sent on Mr. Fant's phone, you said you were waiting

2   on something.  What were you waiting on at that point?

3   *A.*    I was waiting to get the search warrant to get the

4   contents of the phone.

5   *Q.*    So you had already submitted an affidavit in

6   support of the search warrant?

7   *A.*    I can't recall the timeline of those -- exact

8   timeline of those events.

9   *Q.*    Well, if you were waiting on getting a search

10   warrant wouldn't the affidavit have already had of been

11   presented?

12   *A.*    Like I said, I can't recall the exact timeline of

13   when that alarm went off versus when I submitted the

14   affidavit or was waiting on a search warrant.  I can't

15   recall the exact timeline of those events.

16   *Q.*    Did you -- once you got -- once you saw the phone

17   light up, did you do an amended affidavit?

18   *A.*    I don't think I had submitted the first affidavit

19   yet.

20   *Q.*    Oh, you had not?

21   *A.*    Like I said, I don't recall the exact timeline and,

22   I mean, I don't -- I don't recall the exact timeline.

23   *Q.*    You said you were waiting for the affidavit.  What

24   were you -- I mean, when I think of waiting for the

25   affidavit I think maybe you've submitted the paperwork or

*EXAMINATION OF JOSEPH PALAZZOLO*

1   waiting for the warrant.  I think you submitted the

2   paperwork to get the warrant.  You were just waiting for

3   a judge to respond to the warrant.  Is that way off?

4   *A.*    Like I said, I don't recall the exact timeline of

5   events.  I don't know at that time when that alarm went

6   off, if I had submitted the affidavit and was waiting on

7   a judge to look at it, or if I hadn't yet sent the

8   affidavit, or I had the warrant and I was waiting to take

9   the phone to the secret service.  I don't know the exact

10  timeline of those events.

11  *Q.*    When you went into the -- into the house at 1001

12  Creston Avenue, you remember talking to an Elroy Falkner?

13  *A.*    I do remember talking to Elroy Falkner, but it was

14  inside the residence.

15  *Q.*    Oh, okay.  When did you talk to him?

16  *A.*    Downtown at our office later in the evening.

17  *Q.*    Looking at Paragraph 11 of your affidavit, agents

18  interviewed the individual who accepted parcel and placed

19  it on Fant's bed.  The individual stated the pill press

20  did not belong to him and stated the pill press, any

21  other narcotics, besides the marijuana under his bed and

22  the three firearms belonged to Fant.  You remember saying

23  that in the affidavit?

24         You need to take a look at it?

25  *A.*    I'll take a look at it.

*EXAMINATION OF JOSEPH PALAZZOLO*

1  Q.   I'm just going to give you the one page.

2  A.   That's fine.

3       (Reviews document.)

4  Q.   Did I read that accurately?

5  A.   Yes, you did.

6  Q.   And do you remember after the criminal complaint

7  was filed Mr. Fant had a suppression hearing, I mean, not

8  a suppression hearing, that was for another day.  He had

9  a detention hearing.  You recall that?

10 A.   Yes.

11 Q.   And you testified at the detention hearing,

12 correct?

13 A.   I did.

14 Q.   And do you remember at the detention hearing being

15 asked on Page 35, line 25, now you stated -- you

16 questioned the person who was being detained regarding

17 weapons in the residence, correct?  And you answered

18 "yes."  You remember that?

19 A.   I'm going to have to see the transcript.

20 Q.   Sure.  It's at the bottom of Page 11.  Help

21 yourself.

22 A.   (Reviews document.)

23 Q.   Would you like to see some more of it than just

24 that?

25 A.   I figured I would -- ask me more questions on the

1   detention hearing, then, yes.  But if this is the only

2   one then I can go with this.

3   *Q.*    I mean, I've got more pages I can give you, before

4   and after, if you need to put timestamps.

5   *A.*    That's okay.

6   *Q.*    So at the detention hearing do you recall being

7   asked -- so, he was detained and taken to the Memphis

8   office, correct?  And you said, correct, at some point.

9        Now, you stated that you questioned the

10  person who was being detained regarding weapons in

11  the residence, correct?  And you said, "Yes."  At

12  that time you were referring to Eric Falkner,

13  correct?

14  *A.*    Yes.

15  *Q.*    And you were asked if that person indicated weapons

16  did not belong to him.  And you said, "That's correct."

17       And the question was, "Did he indicate who

18  the weapons belonged to?"

19       And you said, "No, he did not."

20       Now, that would be inconsistent with what

21  was said in the affidavit of complaint, correct?

22  *A.*    I mean, I'd have to look at it again; that

23  section --

24  *Q.*    Sure.

25  *A.*    Not only the affidavit.

*EXAMINATION OF JOSEPH PALAZZOLO*

1    Q.    All right.  Oh, yeah.  That's the entire affidavit.

2    A.    (Reviews document.)

3    Q.    Would you agree with me that would be inconsistent

4    with what's in the affidavit?

5    A.    Yes, sir.

6          **MR. LEFFLER:**  Your Honor, that's all the

7    questions I have.

8          **THE COURT:**  Any redirect?

9          **MR. ALLEN:**  Just very briefly, Your Honor.

10

11                **REDIRECT EXAMINATION**

12   QUESTIONS BY MR. ALLEN:

13   Q.    Special Agent Palazzolo, you had mentioned there

14   was a pill press found in the bedroom that -- what you

15   had believed to be Mr. Fant's bedroom, right?

16   A.    Correct.

17   Q.    And then was there -- did you mention a blender?

18   A.    I did not.

19   Q.    Was there a blender found over in there?

20   A.    There was in the closet.

21   Q.    And what was in it?

22   A.    I'd have to verify with the lab results that came

23   back.  But I think it did test positive for

24   methamphetamine and other substances.

25   Q.    Was it residue that was kind of caked on there?

*EXAMINATION OF JOSEPH PALAZZOLO*

1   A.     Yes.

2   Q.     And what did that all tell you with the pill press

3   and the blender, what did that lead you to believe

4   regarding Mr. Fant?

5   A.     That he was pressing homemade extasy pills or MDMA.

6   Q.     When I asked you earlier about the things that you

7   knew leading up to the briefing and that you mentioned

8   that -- do you remember that line of questioning earlier?

9   A.     Yes.

10  Q.     Was Brian Scott there?

11  A.     Yes.

12  Q.     Was Inspector Weeks there?

13  A.     Yes.

14  Q.     And your group supervisor, Simenson, was he also

15  there?

16  A.     Yes.

17  Q.     So they were aware of all that information at that

18  time as well?

19  A.     Yes.

20  Q.     Before going into the residence?

21  A.     Yes.

22  Q.     On August 18, 2021?

23  A.     Yes.

24  Q.     And then, lastly, you were asked about the pill

25  press being shipped to the clothing company and then also

UNREDACTED TRANSCRIPT

*EXAMINATION OF JOSEPH PALAZZOLO*

1    Ms. Robinson's name was listed on that.  Do you remember

2    that line of questioning?

3    *A.*    Yes.

4    *Q.*    Is it common or have you ever encountered

5    individuals placing items in other people's names before?

6    *A.*    Yes.

7    *Q.*    What -- tell me how you encountered that and what

8    you've learned from that.

9    *A.*    I mean, I encountered in other pill press cases,

10   people ordering binders.  And what I mean by, "Binders,"

11   is, like a powder added to the substance to dilute it or,

12   you know, add another effect to it.  And someone who is

13   pressing pills will use somebody else to order the

14   binders, because the binders are also tracked.  So that's

15   just one other instance where someone orders something in

16   somebody else's name or uses it -- puts the order in

17   someone else's name or has them order it so law

18   enforcement won't be looking at that person.

19   *Q.*    That was my ultimate question is that, what's the

20   purpose of putting someone else's name, is it based on

21   your training experience, what?

22   *A.*    To avoid detection by law enforcement.

23   *Q.*    Did you believe in this investigation that the

24   Dirty Life Clothing Company was legitimately using the

25   pill press?

*EXAMINATION OF JOSEPH PALAZZOLO*

1    *A.*    No.

2    *Q.*    Did you believe that pill press was actually going

3    to Naportia Robinson?

4    *A.*    I don't know who -- didn't necessarily know who it

5    was going to, but I knew the address it was going to and

6    who it was associated with that address.

7            **MR. ALLEN:**  That's all the questions I have,

8    Your Honor.

9            **THE COURT:**  Any further questions?

10           **MR. LEFFLER:**  Yes, Your Honor.

11

12                   **RECROSS-EXAMINATION**

13   QUESTIONS BY MR. LEFFLER:

14   *Q.*    Mr. Palazzolo, I believe you testified that the

15   pill press was found with some colored powders that were

16   nearby.  Do you recall that?

17   *A.*    Yes.

18   *Q.*    What were the colored powders?

19   *A.*    I'd have to refer to the lab results.  I sent them

20   off and had them tested by a DEA lab.  But off the top of

21   my head I can't recall.

22   *Q.*    Were they illegal narcotics?

23   *A.*    Like I said, I can't recall without the lab

24   results.

25   *Q.*    Okay.

*EXAMINATION OF JOSEPH PALAZZOLO*

1        **MR. LEFFLER:**  That's all I have, Your Honor.

2        **THE COURT:**  You may step down.

3        (Witness excused.)

1      THE COURT:   Any additional witnesses or proof

2  for the Government?

3      MR. ALLEN:   No, Your Honor.

4      THE COURT:   That concludes the Government's

5  proof?

6      MR. ALLEN:   Yes, Your Honor.   Thank you.

7      THE COURT:   Mr. Leffler, on behalf of the

8  defense, any evidence or testimony?

9      MR. LEFFLER:   No other evidence, Your Honor.

10      THE COURT:   Very well.   That will conclude,

11  then, the evidence, although Mr. Leffler had asked

12  earlier about some mail cover.   I don't know whether it

13  was the mail --

14      MR. LEFFLER:   It was the regulations.

15      THE COURT:   Well, before, during your opening,

16  I thought.

17      MR. LEFFLER:   Yeah, oh, I --

18      THE COURT:   Was that different?

19      MR. LEFFLER:   It's a little different.   But

20  what I was mentioning in the opening was not a -- ended

21  up not being relevant.

22      THE COURT:   Okay.   So, now --

23      MR. LEFFLER:   It's just the regulations that

24  authorized the mail watch is what we were looking for.

25      THE COURT:   Okay.   Very well.

UNREDACTED TRANSCRIPT

1           Then I'll hear argument at this time,

2     although, I don't know from Mr. Leffler, your

3     comments, if you're waiting -- it sounds like the

4     Government is going to look for this information,

5     provide it if available, and then at that time, file

6     a supplemental brief.  Was that your request?

7           **MR. LEFFLER:**  Well, we'll get it to Mr. Haley

8     to be marked as a late-filed exhibit.  So in that case

9     that would Exhibit Number what?

10          **CASE MANAGER:**  Number 8.

11          **MR. LEFFLER:**  Number 8.

12           And then, yes, Your Honor, if I

13    could -- once we do that I can answer in writing --

14    do the closings in writing.  It's up to you.

15          **THE COURT:**  Well, it's up to you.  Would you

16    prefer to make your close now or would you prefer to wait

17    for these documents and review the evidence and make your

18    close in writing?

19          **MR. LEFFLER:**  I think that document could be

20    important, so I think I'd rather wait until that time.

21          **THE COURT:**  Government?

22          **MR. ALLEN:**  Judge, if I may.  I know we've all

23    got a lot on -- if I could suggest we do a brief version

24    of closing now while everything's fresh in our mind and

25    then if -- once we obtain any documents regarding the

 1    regulations for the mail watch -- and my understanding of

 2    where we're at at this point, leading into the hearing,

 3    Mr. Leffler wasn't sure if it was going to be a mail

 4    cover or a mail watch.  And it came out that there was a

 5    mail watch.  There's not the documents, which I believe

 6    Mr. Leffler thought may exist with the mail cover, which

 7    Special Agent Weeks said it's scanned and you see a

 8    picture of it it's more regulated.

 9              So I think that discovery is what he had

10    mentioned might come out that he was going to

11    request from the Government, but that didn't come to

12    light.  So my understanding is the only supplemental

13    information that I'm presenting to the Court is, I'm

14    going to go speak with Inspector Weeks regarding

15    their authority on a mail cover.

16              **MR. LEFFLER:**  Watch.

17              **MR. ALLEN:**  Mail watch, and submit that and

18    then there may be some additional argument.  So, maybe we

19    can argue about this today, finalize as much as we can.

20    And then if there's something additional that comes from

21    any regulations that's presented, Mr. Leffler can have a

22    chance to continue argument.  I wouldn't oppose that.

23              **THE COURT:**  Well, there's a few ways we can do

24    this.  But one may be if you want to make argument now,

25    I'll give you -- both sides an opportunity to be heard.

UNREDACTED TRANSCRIPT

1    And even if one side decides not to make argument, the

2    other side can make argument.  That's fine.  If you

3    decide that you just want to go ahead and make argument

4    with supplementing the record with post-hearing briefing,

5    I'll allow that.  Or if you just want to defer completely

6    and wait and go ahead and make your closing remarks or

7    arguments in your post-hearing briefing, that's okay,

8    too.

9         **MR. LEFFLER:**  We can go ahead.  I just need a

10    second.  We can go ahead and argue it today.  I just need

11    a moment with my client first, because there's something

12    he needs to tell me.  I need to see if that's going to be

13    part of the argument or not.

14         **THE COURT:**  That's fine.

15         **MR. LEFFLER:**  (Conferring with client.)

16         **MR. ALLEN:**  Your Honor, may I have Special

17    Agent Palazzolo excused?  He's got some other matters to

18    attend.

19         **THE COURT:**  Yes, that's fine.

20         **MR. ALLEN:**  Thank you.

21         **SPECIAL AGENT PALAZZOLO:**  Thank you, Your

22    Honor.

23         **THE COURT:**  I have no preference as to who

24    goes first.  Mr. Allen, if you want to argue first.

25

1                      **CLOSING ARGUMENT**

2            **MR. ALLEN:**   Thank you, Judge.  I'll be brief.

3    I'm going to rely mainly on our filed responses, because

4    I think they address the matter pretty well.  I don't

5    think anything from the hearing today really changed

6    that.

7                 The first thing I would say regarding

8    the parcels, Mr. Fant has a duty to establish

9    standing there.  Some of those were addressed to his

10   address.  We're not contesting that he lacks or

11   doesn't have standing for 1001 Creston.  That was

12   brought out.  The utilities were in his name.  So

13   there was a lease found.  He does have standing for

14   those, but I think he still has to show some

15   standing for these parcels, specifically, the ones

16   that are not addressed to him.

17                 To me, it's an attempt to avert to law

18   enforcement by having packages put in a false name.

19   And then that way you get them sent to an address

20   and then it's, well, they're not mine.  That's not

21   my name.  But then later you turn around and try to

22   suppress them.  At some point you would have to say

23   the packages are yours, which in turn he would

24   essentially be claiming the methamphetamine, or he's

25   trying to argue the -- I'm not saying it's my

UNREDACTED TRANSCRIPT

1    package, but I want to suppress it, because it's

2    coming to my house.

3              So I think there needs to be at least

4    some showing of standing there.  But, regardless, if

5    you get to the question and decide Mr. Fant has

6    standing, the affidavits are all sufficient of

7    themselves.  Each parcel warrant was established

8    that inspector Weeks pulled it after looking at the

9    residence, multiple packages coming from a source

10   city.  So he placed that in there.  He looked at the

11   physical characteristics of the package.  He put

12   that in each affidavit.  And then after he detained

13   the parcel he had a K-9 sniff that alerted each time

14   that was done, in addition to the steps previously

15   taken.

16             So, at this point, the law's pretty

17   clear in the Sixth Circuit that a K-9 alert is

18   sufficient for probable cause.  So, Your Honor, in

19   hearing -- in reviewing each affidavit, had the K-9

20   sniff and alert, based on Sixth Circuit precedent,

21   in addition to the other characteristics and the

22   steps taken in the affidavit.

23             The issue regarding that no narcotics

24   were found in the May 3rd one, I don't think that's

25   of consequence.  The K-9 alerts to the presence of

UNREDACTED TRANSCRIPT

1  the odor of narcotics and therefore -- that doesn't

2  mean that these clothing items that were ultimately

3  found in the parcel weren't around narcotics.  I

4  don't think that equates to a false/positive.

5            Detective Maliskas said that these K-9's

6  noses are way stronger than ours.  So I'm not sure

7  what he's smelling.  But I don't think that equates

8  to a false alert and I don't think it's misleading

9  to not put that in the following affidavit.  That

10  was eight days later.

11            So, for each affidavit you have the

12  parcel being detained, plus the K-9 sniff, written

13  in the affidavit and all detailed.  And each time

14  the K-9 was listed, that was NNDDA-certified.

15            So, each of those parcels -- and that's

16  just within the four corners of the affidavit.  I

17  think it's sufficient on its own.

18            I think you -- I think after that you

19  have a narrowly triggered condition of the

20  anticipatory search warrant of it crossing the

21  threshold.  Special Agent Weeks said that they

22  weren't going to search that house if that condition

23  didn't become present.  I asked how it factored into

24  the equation that that was directed to a fake name

25  at that address and he said that it's -- the

1    triggering event is it crossing the threshold.  It

2    didn't have to be a fake person to accept the parcel

3    across -- the search was done in accordance with the

4    search warrant.  And then ultimately Mr. Fant is

5    detained, based on an investigatory stop.  It wasn't

6    a traffic stop.  I asked, specifically, Palazzolo,

7    what did you know, leading up to the search warrant.

8    He named off several things, including that these

9    parcels were going to Mr. Fant, that the pill press

10   was there.  He intended to detain and speak to

11   Mr. Fant and ultimately arrest him on that date.

12           So, I don't think we need a traffic stop

13   to pause that vehicle.  We just needed to believe

14   that he was in there.  And that was corroborated by

15   Scott, saying, I saw someone that matched this

16   description that came.  Simonsen gets behind the

17   vehicle, runs the tag, sees that it's a "Fant" name

18   associated with it, then they stop and then he's

19   detained.

20           At that point, Mr. Fant is the assed

21   over to Palazzolo.  He goes to interview him.  So

22   there was nothing, really, I don't think, there to

23   suppress, because Palazzolo's testimony was that he

24   attempted to ask Mr. Fant to waive his rights and he

25   gave no statement, other than he didn't want to talk

UNREDACTED TRANSCRIPT

1   to anybody.  There were some voluntary statements

2   made the next day, but the phone was taken into

3   custody after they detained Mr. Fant and then the

4   agents went a step further to obtain a search

5   warrant for that.

6           So I think I've addressed most of the

7   arguments, but I would rely on our written responses

8   for anything that I've omitted.  But I would just

9   say there's probable cause for each affidavit.  The

10  searches were done pursuant to those affidavits.

11  And then at the end of the day, we still have Leon,

12  that there's a good faith that these officers should

13  have known that these warrants -- could they have

14  reasonably relied upon them.  And I think that's

15  what they did.

16          So I'd ask Your Honor to deny the -- I'm

17  sorry, the suppression of the search warrants on the

18  day of Mr. Fant's arrest.

19          **THE COURT:**  Response?

20                  **<u>CLOSING ARGUMENT</u>**

21          **MR. LEFFLER:**  Your Honor, in the April 14th

22  part of the investigation that officer Palazzolo just

23  testified to, they knew as of April 14th of 2021, that

24  the pill press was not Mr. Fant's pill press.  They were

25  looking to Naportia Robinson.  She was the named

1    recipient of it.

2              So, at that point, there was really no

3    further need for investigation of Mr. Fant.  Yet,

4    the investigators kept going at it.  They found --

5    they stated in an application for a search warrant

6    of the first package, that referring Mr. Fant as a

7    Memphis-based narcotics trafficker and manufacturer

8    currently living at 1001 Creston Avenue, when

9    there's been no arrest record showing that he had

10   any record at all having to do with narcotic

11   trafficking.  There had been no previous seizures of

12   opioids.  It says he's suspected to be receiving

13   opioids.  There are no opioids even involved in this

14   case.

15             Mr. Allen brought up the question of

16   Leon.  Well, I think that Your Honor can -- from the

17   fact that you were not told about the April 3rd dry

18   run, if you will, of Bono, that there is -- a

19   supporting affidavit contained reckless falsity.

20   And if that's true, then Leon doesn't apply.

21             All the affidavits are based on these

22   broad categories that had never really been

23   explained as to why they bring up any suspicion

24   towards Mr. Fant, whatsoever.

25             And then finally, the affidavit for the

UNREDACTED TRANSCRIPT

1    search or for the anticipatory warrant on the search

2    of Mr. Fant's house at 1001 Creston states at

3    Paragraph 14 -- I was asking about this here.  "Your

4    affiant intends to reseal the above-mentioned parcel

5    with imitation narcotics inside the parcel and will

6    attempt to make a controlled delivery to William

7    Fontaine at the premises, which is more

8    fully-described in Attachment A."

9              Well, everybody that has testified today

10   that knew anything about the name, William Fontaine,

11   believed that that name was in essence, Willie Fant.

12   And the controlled delivery that they were -- that

13   they proposed to the Court, it has to be narrowly

14   tailored.  And they set out the narrow tailoring of

15   it right here:  "Intends to reseal the

16   above-mentioned parcel with imitation narcotics."

17   They did.  "Inside the parcel in an attempt to make

18   a controlled delivery," not to 1001 Creston, but to,

19   "William Fontaine at the premises, which is more

20   fully-described in Attachment A."

21             So, the triggering event never occurred

22   because Mr. William Fontaine, a.k.a. Willie Fant,

23   wasn't even at the residence at that time.  It

24   was -- the package was placed down -- and I think

25   that the people that were surveilling the property

 1   knew that Mr. Fant had left with his uncle before

 2   the package ever arrived.  The package got put down.

 3   It never got put in the hands of Willie Fant, as the

 4   warrant required as the trigger mechanism for it.

 5   So anything that was found in the residence on that

 6   anticipatory search should be suppressed.

 7              I would forge that receiving the

 8   additional information which, for the record, is the

 9   regulations of the postal service with regard to the

10   issuance of mail watches to show the authority of

11   agent Weeks to engage in a mail watch.

12              Once we received that, then I don't know

13   that any further argument will be necessary.  But if

14   I -- once I review it and I've changed my mind on

15   that, I will gladly inform the Court so we can

16   supplement these arguments.

17         **THE COURT:**  So what we can do is, in

18   anticipation of that, we can keep the record open until

19   maybe September 30th to allow you an opportunity to

20   review whatever the Government submits to you and then

21   follow up with a Court supplement for the record.  And if

22   it turns out you don't get it in a timely manner that

23   would allow you to brief, you can ask for additional

24   time.  But for now we set it for September 30th.

25              **MR. LEFFLER:**  That would be fine, if

UNREDACTED TRANSCRIPT

1    that's ...

2              THE COURT:  And then, on the Government --

3              MR. LEFFLER:   I'll get with Mr. Allen on that.

4              THE COURT:  So if nothing gets filed by

5    September 3rd, I assume that there's nothing further for

6    the Court to consider on that limited issue.  But if

7    something gets filed I'll give the Government until

8    October 7th to file a response to whatever Mr. Leffler

9    might file.

10             MR. LEFFLER:  Thank you, Your Honor.

11             THE COURT:  September 30th and October 7th.

12   The Court, at the time -- again, if nothing gets filed,

13   then I assume that I won't be expecting anything.  At

14   that point, the record will be considered closed for

15   purposes of suppression issues or if the Court issues

16   recommendation.  Upon receipt of the report

17   recommendation, the Court report -- part of the 14 days

18   to file any objections with a district judge.  Failure to

19   timely file objections may constitute a waiver of further

20   objections and any further right to appeal those issues

21   any further.

22             MR. LEFFLER:  All right.

23             THE COURT:  Very well, we have the exhibits.

24   They're all marked.

25             THE CASE MANAGER:  Yes, Your Honor.

UNREDACTED TRANSCRIPT

1          **THE COURT:**  I'll take the matter under

2     advisement.  All parties are excused.

3          **MR. ALLEN:**  Thank you, Judge.

4          **MR. LEFFLER:**  Thank you, Judge.

5          (WHEREUPON, the foregoing proceedings were

6          adjourned at 4:00 p.m.)

7               (Adjournment).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

1

2                     **C E R T I F I C A T E**

3          I, April Lassiter-Benson, do hereby certify that the

4     foregoing 168 pages are, to the best of my knowledge,

5     skill and ability, a true and accurate transcript from my

6     stenotype notes in the matter of:

7

8     UNITED STATES OF AMERICA

9     vs.

10    WILLIE FANT

11

12         Dated this 25th day of October, 2022.

13

14    S/APRIL LASSITER-BENSON
      Official Court Reporter
15    United States District Court
      Western District of Tennessee
16

17

18

19

20

21

22

23

24

25

                        UNREDACTED TRANSCRIPT